Filed 7/11/11

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S099414 |
| v. | ) | |
| | ) | |
| KENNETH RAY BIVERT, | ) | |
| | ) | Monterey County |
| Defendant and Appellant. | ) | Super. Ct. No. SS991410 |
| _____ | ) | |

A jury convicted defendant Kenneth Ray Bivert of the first degree murder of Leonard Swartz. (Pen. Code, § 187.)[1] The jury found that defendant used a deadly weapon in the commission of the murder (§ 12022, subd. (b)) and found true the special circumstance allegations of prior conviction of first degree murder and lying in wait (§ 190.2, subd. (a)(2), (15)). The jury further convicted defendant of assault with a deadly weapon by a life prisoner (§ 4500) and found he had been convicted in 1988 of three counts of first degree murder (§§ 187, 1170.12, subd. (c)(2), 667, subd. (a)).

After a penalty trial, the jury returned a verdict of death. The court denied a motion for a new trial and the automatic application to modify the verdict

---

[1]    All statutory references are to the Penal Code unless otherwise specified.

(§ 190.4, subd. (e)), and sentenced defendant to death.  This appeal is automatic. (§ 1239, subd. (b).)

## I.  FACTS

### A.  Guilt Phase

Defendant was convicted of charges related to the November 23, 1996, assault of inmate Rick Dixon and the February 5, 1997, murder of inmate Leonard Swartz.

#### 1.  *The People's Case*

##### a.  *Assault of Rick Dixon*

In the fall of 1996, defendant and Dixon were inmates at the Salinas Valley State Prison (SVSP) in Monterey County.  Building B, in which both were housed, was self-segregated by the inmates according to race; the White and Hispanic inmates occupied one side of the dayroom and yard, while the Black and other-race inmates occupied the other.  Dixon understood defendant to be "in charge of 'the woods,' " a group of White inmates.  Defendant approached Dixon and told him there was a "piece of shit" White pedophile named Dennis, who had purchased drugs from a Black inmate, an act considered "bad business" by "the woods."  Defendant told Dixon that if he wanted to "earn his bolts" he would have to "deal with" inmate Dennis.  Dixon understood this to mean that if he wanted to gain membership in "the woods" he would have to stab Dennis.  Dixon refused, even though he knew he might suffer consequences for not acceding to defendant's request.  Dixon later overheard defendant say he wanted to "do something drastic to get moved . . . to Pelican Bay [State Prison] where . . . he could get more run of the place."

On November 23, 1996, as Dixon was walking toward his cell, inmate Steve Petty snuck up behind him, wrapped shoestrings around his neck, and pulled

2

him backward. Defendant then approached and stabbed Dixon with a homemade ice pick seven times in his upper chest, sides, and lower abdomen. A contrasting version of events was offered by inmate D,[2] who witnessed the assault; he testified it was defendant who grabbed Dixon from behind. He also saw Petty toss something into the shower area.

A correctional officer[3] heard the commotion, sounded the alarm, and told all inmates to drop to the ground where they stood. Defendant and Petty were close to one another, separated from the other inmates in the room, and were the inmates closest to the shower area. Officers saw no blood on defendant's clothing, but they observed what looked like rope burns on his hands and found a weapon in the shower. While recovering from his wounds in the prison infirmary, Dixon viewed a photo lineup and identified defendant and Petty as his assailants. Dixon indicated that defendant had told him Steve Petty was his "road dog," or crime partner, and that they "ran around together" in prison.

Defendant was transferred to administrative segregation at Pelican Bay State Prison pending the investigation into the stabbing. He was returned to the general population at SVSP in early 1997. While defendant was on the prison yard shortly after his return, inmate D asked him if he was going to try to get his old prison job back. Defendant replied that he "wasn't going to be around that long" because "he was going to hit a suspected child molester" who "needed to be gutted."

---

[2]    Because of the known risks to the safety of inmates who testify against fellow inmates, many of the witnesses at this trial were referred to in the public record not by their names, but by code names, e.g., inmate A, as agreed to by court and counsel.

[3]    Unless otherwise noted, all of the witnesses hereafter referred to as "Officer" were correctional officers at SVSP.

### b. *Murder of Leonard Swartz*

Inmate C's cell was on the first tier, directly beneath defendant's on the second tier, and through the ventilation system he could hear sounds from defendant's cell. A few days before February 5, 1997, inmate C could hear scraping from upstairs and, suspecting that defendant was making an inmate-manufactured weapon, or shank, he "hollered up and asked the people that lived upstairs if they wanted everybody to know what they were doing." Defendant answered that it didn't matter to him if anybody heard what he was doing.

Over breakfast on the morning of February 5, 1997, defendant told inmate C that inmate Leonard Swartz "was a child molester" who "didn't belong on the face of the earth for what he did and he needs to be dealt with." Defendant said that "one of his missions while in prison was to take care of the scum such as that, that people with crimes like that didn't belong. They didn't belong alive." Defendant believed in "the White race taking care of their own," and that "over the years [the White] race had gotten soft, and he couldn't believe the people they were letting walk around nowadays." Defendant was known to approach young, new prisoners and "try to plant seeds in them as far as what the White race is all about and what they should do."

Defendant told inmate C that he, with another inmate, had "committed another stabbing in the same yard . . . and that they threw a shirt over [the victim's] head and stabbed him numerous times." Defendant then told inmate C that he would "take care of" Leonard Swartz himself.

At 11:25 a.m. on February 5, 1997, Officer Erica Carbajal was on duty in the dayroom in building B at SVSP when two inmates approached her and asked for some paperwork that was in a nearby office. She retrieved the paperwork and, when leaving the office, noticed that the dayroom was uncharacteristically quiet. She turned and saw inmate Leonard Swartz stagger toward her, covered in blood

4

and clutching his hands to his throat. He fell to the floor in front of her. She sounded the alarm, ordered the inmates to drop to the floor where they stood, and summoned medical assistance.

At that same time, inmate F was gathering his belongings from his cell on the second tier to go to the showers when he heard the sounds of a fight. He turned and saw defendant punching and slapping another inmate, who was trying to fend him off, and then saw the other inmate grab his neck and defendant throw something. Inmate G heard the attack. He turned to see defendant and Swartz standing face to face, and defendant then made two quick motions that landed near Swartz's neck. Inmate A, who had been playing dominoes with Swartz just moments before the attack, witnessed the stabbing and identified defendant as the assailant.

Officer Tiffany Haro was the first to reach Swartz. She tried to staunch the flow of blood from his neck with a stack of paper towels from the office, and when that did not work, she and Officer Jeffrey Mantel placed Swartz in a chokehold to apply more pressure. Swartz nonetheless continued to bleed profusely while he was being carried on a stretcher to the infirmary, where staff began treatment. Shortly thereafter, he was transported by ambulance to Natividad Medical Center in Salinas.

Officers who arrived at the dayroom in response to the alarm saw trails and pools of blood. The officers instructed the inmates to move up against the walls of the dayroom, where they were searched for wounds, weapons, or any other relevant evidence. One officer discovered a shank on the floor near the pools of blood. The officers who searched defendant noted his hands were trembling and he was shaking. Inmate G observed that while defendant was being searched his

5

legs shook. Officers conducted a Hemastix test[4] on defendant's hands; the test strip reacted positively for the presence of blood. During the test, defendant's hands continued to shake, his chest quivered, and he was sweating. None of the other inmates were shaking. When asked why he was shaking, defendant responded that he was cold. When asked why he was sweating if he was cold, defendant had no response.

The officer who collected defendant's clothing noted red spots on defendant's blue jeans and shoes. A blue chambray state-issued shirt was found in the nearby stairwell, draped over the handrail. It had red spots on the sleeves and was still wet with perspiration.

On February 22, 1997, 17 days after the attack, while still in the hospital, Leonard Swartz suffered an epileptic seizure and died. Forensic pathologist Dr. John Hain testified the underlying cause of death was the stab wound to the carotid artery in Swartz's neck. The wound had caused severe blood loss, which caused brain damage in the form of strokes, which in turn caused the fatal seizure.

Defendant was transferred to Corcoran State Prison following the attack, where he was housed with inmate J for a week in May 1997. Defendant admitted to inmate J that he had stabbed a fellow inmate at SVSP in November 1996, and that he was upset with himself for using an ice pick type of shank because he knew that weapon would not kill anybody. He was upset that that victim had lived. He admitted that while he was in administrative segregation for that stabbing, he made up a list of victims targeted for "hits" upon his return to the general population at SVSP. Defendant said he was "exalted" to have been released back

---

**4** A Hemastix test is an investigative tool used to detect blood. A small fabric strip is dipped in distilled water and rubbed on the suspect area. If blood is present, the strip will change colors.

to the same yard where he was before and where the inmates on his hit list were housed. He said "it was like a gift" when they put him "right in the building, right where he wanted to be to get that dude" who was at the top of his hit list. He knew the man to be a child molester and said he prepared to kill him by making a knife specifically for him. He sharpened one whole side of the weapon on the ceiling of his cell "so that when he stuck it in . . . it could be like a ripping piece, a killing piece." Defendant then told inmate J that he had lain in wait for his victim in the dayroom. He had stood by a table with his leg propped up on one of the stools and the shank in his back pocket, waiting for the man to walk past him. When the man did so, defendant "did a full handball swing and just buried it in his neck," "[ripping] the dude's neck wide open." Defendant knew where the carotid artery was, and that "if you could sever that, the chances of a victim living [were] not very good." Defendant said he was able to clean his hands so there was no visible blood, but there was blood on his shoes. He reasoned he could explain away any blood on his hands and clothes by saying that "the dude bumped into me when he was leaking." He had set out to do the killing, he was happy about it, and he would have bragging rights when he was returned to Pelican Bay State Prison.

Defendant was transferred to Pelican Bay State Prison sometime in 1997 and was housed in the same yard as inmate R. Defendant admitted to him that at SVSP he had stabbed an inmate who survived and "got away with it" because he "had a change of clothes." Defendant's cellmate at Pelican Bay was inmate P, who testified that defendant told him the "gene pool should be cleansed of all defects, physical and mental," and "anybody with a defect should be whacked." Defendant told inmate P about the second stabbing and how he got blood on his shirt, took it off, grabbed someone else's shirt and put it on, and "they were trying to give him murder" for it.

Margaret Aceves, senior criminalist at the Department of Justice's DNA lab, concluded DNA in Swartz's blood matched that present on the pants collected from defendant on February 5, 1997.

Gary Craft, an investigator with the Monterey County District Attorney's Office, testified that inside a book confiscated from defendant's property at Pelican Bay State Prison were the handwritten words, "Nonexistence of the unfit has and will be the law of nature" and "The one who knows the secret does not speak; the one who speaks does not know the secret."

### 2. Defendant's Case

Defendant offered evidence to show that the inmates who testified against him had reason to falsify their stories because they were given benefits in exchange for their testimony, in that they were transferred to a "soft yard," a housing placement within the department of corrections that did not have the same inherent risks of danger as a general population yard. He also offered the testimony of a Department of Justice criminalist who examined defendant's cell at SVSP and found no signs of scraping.

## B. Special Circumstance Phase

The prosecution presented certified documents that proved defendant had suffered three prior convictions for first degree murder in 1988 and was a life prisoner at the time of the capital murder.

## C. Penalty Phase

### 1. The People's Case

The People offered as evidence in aggravation defendant's leading role in three homicides in Yolo County and participation in two in-prison assaults.

Over the course of the Labor Day weekend in 1987, when he was a 17-year-old high school student, defendant, armed with a shotgun, and a friend, armed

8

with a handgun, went to Portuguese Bend, a slough northwest of Sacramento, to "drink and party and shoot our guns off." They noticed a fisherman with a pickup truck camping near the water. Defendant told his friend he wanted to use the fisherman's truck to rob a nearby bank and was willing to shoot the fisherman in order to get the truck. The two friends approached the fisherman, and after a few minutes of conversation, when the fisherman knelt down to set a hook, defendant shot him in the back of the head. Defendant and his friend dumped the body in the slough, took the truck, and after driving around for a while drove the truck into the slough.

The following Tuesday, defendant skipped school and, with his uncle's handguns, again visited the slough with a friend, where they ran into a couple who were fishing. Defendant told his friend he wanted to take their car to use to rob a bank. After a few minutes of conversation, defendant shot the woman in the back and then continued shooting, hitting and killing the man. When the woman continued to scream, defendant shot her in the head, killing her. Defendant was "jovial" when he threw their bodies and belongings into the slough and took their car. Defendant and his friend drove to Oregon, where they were apprehended.

Defendant eventually pleaded guilty to the three murders and was sentenced to a term of 52 years to life imprisonment. He was serving this term in SVSP at the time of the capital crime.

In September 1995, while incarcerated at California State Prison, Sacramento, defendant joined in a fight that started between two other inmates on the administrative segregation yard. He only stopped fighting after the guards repeated oral warnings and fired two rubber bullets.

In January 1997, on the administrative segregation yard at SVSP, defendant approached and struck inmate Wright. Inmate Steve Petty joined the fight, which stopped only after the guards repeated oral warnings and fired two rubber bullets.

9

## 2. Defendant's Case

Defendant presented no evidence at the penalty phase of trial.

## II. CLAIMS

### Claim I. Denial of Defendant's Motion for Separate Juries for the Guilt Phase and the Special Circumstance and Penalty Phases

Before trial, defendant moved to have separate juries decide his guilt and the truth of the prior-murder special-circumstance allegation, with the special circumstance jury also deciding penalty. He conceded that section 190.1 already requires the truth of a prior-murder special-circumstance allegation to be determined in a separate proceeding following the guilt phase,[5] but he argued that having separate juries for each proceeding would insulate the guilt phase jury from voir dire on the prior murder convictions. In essence, he argued he should be allowed to voir dire the guilt phase jury without mentioning the prior murder convictions and to voir dire the special circumstance and penalty phase jury about their thoughts on his prior murder convictions, and the only way to do that would be to have separate juries.

---

[5] Section 190.1 provides, in pertinent part: "A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows: [¶] (a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree. [¶] (b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance."

10

The trial court denied his motion, relying on the analysis in *People v. Nicolaus* (1991) 54 Cal.3d 551. There we held that section 190.4, subdivision (c) expresses the legislative intent that both the guilt and penalty phases of a capital trial be tried by the same jury absent a showing of good cause for separate juries for each phase. (*Id.* at pp. 573-574.) The mere desire of counsel "to voir dire in one way for the guilt phase and a different way for the penalty phase" does not constitute good cause for deviating from the clear legislative mandate. (*Id.* at p. 573.) The trial court concluded this reasoning applied equally to a request for separate juries for the guilt and special circumstance phases of trial.

Defendant argues the trial court's ruling violated his rights to a fair trial and an impartial jury. We conclude the trial court did not err.

We review the court's decision for abuse of discretion (*People v. Lucas* (1995) 12 Cal.4th 415, 482-483) and find none. In order to establish good cause for separate juries, defendant must show more than mere speculation that the use of a single jury would result in prejudice (*People v. Pride* (1992) 3 Cal.4th 195, 252-253), or the mere desire of counsel "to voir dire in one way for the guilt phase and a different way for the penalty phase" (*People v. Nicolaus*, *supra*, 54 Cal.3d at p. 573). Defendant's motion was grounded only on his counsel's desire to conduct voir dire differently for each stage of the trial. As recognized in *People v. Yeoman* (2003) 31 Cal.4th 93, 120, "the decision whether to use voir dire to probe prospective jurors' attitudes towards a defendant's other offenses is a tactical one . . . ." The mere desire to minimize or eliminate such tactical decisions in the voir dire of a capital jury does not constitute good cause. (*Nicolaus*, at pp. 573-574.) We find no abuse of discretion in the denial of defendant's motion.

Defendant further asserts the denial of the motion violated his rights to due process and fundamental fairness under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, arguing that trying the case before

11

a single jury limited his ability to adequately voir dire the prospective jurors.  (See *Mu'min v. Virginia* (1991) 500 U.S. 415, 425–432.)  Defendant failed to explicitly make these constitutional arguments in the trial court, but because they do not invoke facts or legal standards different from those the trial court was asked to apply, and merely assert that the trial court's denial of the motion had the additional legal consequence of violating his rights under the United States Constitution, they are not forfeited on appeal.  (See *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)

Although the issues are thus preserved, defendant fails to show the trial court's ruling resulted in fundamental unfairness or the denial of due process. Defendant argues that the prosecution's strongest evidence in aggravation was the three prior murder convictions, and defendant's strongest evidence in mitigation was the fact the victim in this case was a child molester.  Because of the court's ruling, he argues, the prosecution was able to question prospective jurors concerning their thoughts regarding the appropriateness of a death sentence for the murder of a child molester, but he was "unable to ask the prospective jurors if they would automatically vote for the death penalty in light of defendant's prior murder convictions."  He asserts that this resulted in a constitutionally unfair advantage for the prosecution.

In fact, defendant's claim that he was "unable" to ask prospective jurors whether prior murder convictions would cause them to automatically vote for the death penalty is belied by the record.  As the trial court suggested, counsel asked numerous prospective jurors whether the existence of various special circumstances, including a prior murder conviction, would, by themselves, cause them to vote for death.  The questions were framed in a neutral fashion, in a manner that would not necessarily have aroused suspicions that defendant had

12

actually been convicted of prior murders, and elicited answers from prospective jurors that allowed defendant to gain insight into their views on the death penalty.**6**

Defendant fails to show that the trial court's denial of his motion for separate juries precluded him from assessing the qualifications of the prospective jurors or otherwise resulted in fundamental unfairness.

---

**6**    For example, defense counsel asked Prospective Juror No. 8 about "several kinds of special circumstances" including "[l]ying in wait," "murdering someone for financial gain," "poisoning," "previously hav[ing] been convicted of a murder." Counsel then asked with regard to the last of these whether, "if that were true, would you automatically just say that's it, that's the death penalty?"

Prospective Juror No. 8 replied: "No, I wouldn't. But my—I would wonder why that person had the opportunity. [¶] Again, it's my personal belief, but I'm not going to let my personal judgment interfere with me following the letter of the law. Okay?"

He asked Prospective Juror No. 49: "[T]here are other special circumstances. For example, there's one where you could essentially murder someone for financial gain. . . . [Or] where the defendant has been convicted of a previous murder in the first or second degree. And there's another kind of special circumstance where if you kill a judge or a prosecutor. Those are all special circumstances that would entitle a jury to decide whether or not a person lives or dies. [¶] Of the special circumstance examples that I've given you, would any of those tell you 'I'm going to vote for death no matter what the facts are in the penalty phase'?"

Prospective Juror No. 49 replied, "No," that he would be willing to listen to and evaluate each and every circumstance.

Defense counsel asked Prospective Juror No. 82: "I'm going to give you a few special circumstances and what I'd like to know is if you hear any of these special circumstances and if they were assumed to be true, . . . would you automatically say 'that's the death penalty. I don't need to hear anymore'? [¶] For example, there's a special circumstance[] that the murder was intentional and carried out for financial gain. . . . There's another one that says that the defendant was convicted previously of murder in the second degree. . . . There's another one that says if . . . a victim was a peace officer or a judge or a prosecutor that's a special circumstance."

Prospective Juror No. 82 replied: "No. I think I would need to know everything that was connected with the case."

13

**Claim II. Excusal for Cause of Prospective Juror No. 3**

Defendant next contends the trial court erred in excusing for cause Prospective Juror No. 3, who he asserts was not biased against the death penalty, in violation of *Wainwright v. Witt* (1985) 469 U.S. 412 and *Witherspoon v. Illinois* (1968) 391 U.S. 510. Defendant argues the trial court's ruling violated his right to a fair trial and an impartial jury under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We conclude the trial court did not err and defendant's constitutional rights were not violated.

"The United States Constitution guarantees a criminal defendant a trial by an impartial jury. As we have explained in numerous recent decisions in capital cases, '[t]o achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.' [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 778-779.) " 'The state and federal constitutional guarantees of a trial by an impartial jury include the right in a capital case to a jury whose members will not automatically impose the death penalty for all murders, but will instead consider and weigh the mitigating evidence in determining the appropriate sentence.' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 338.)

" ' "In many cases, a prospective juror's responses to questions on voir dire will be halting, equivocal, or even conflicting. Given the juror's probable unfamiliarity with the complexity of the law, coupled with the stress and anxiety of being a prospective juror in a capital case, such equivocation should be expected. Under such circumstances, we defer to the trial court's evaluation of a prospective juror's state of mind, and such evaluation is binding on appellate courts." ' " (*People v. Hawthorne* (2009) 46 Cal.4th 67, 83.) " ' " '[I]t is

14

sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror.' " ' " (*People v. Martinez* (2009) 47 Cal.4th 399, 425.) " 'In other words, the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the "definite impression" that he [or she] is biased, despite a failure to express clear views.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 890.)

In her written questionnaire, Prospective Juror No. 3 indicated that she supported the death penalty, believed in "an eye for an eye," and "would not automatically vote for either life without the possibility of parole or the death penalty," but would "consider all the evidence and vote [her] conscience."

During voir dire examination, the court outlined four categories of thought about the death penalty: Category one would include "persons who do not believe in the death penalty, who would not support the death penalty and who, if placed in this position, would always vote for life without the possibility of parole." Category two would include "those persons who strongly support the death penalty, who are strong proponents of the death penalty, and who, when given the choice, would always vote for a sentence of death. . . . no matter what the evidence or the circumstances . . . ." Category three would include "those people who believe in a death penalty in concept, but who could not personally vote to impose a death penalty. . . . [They] support the theory of a death penalty, . . . but who as an individual just couldn't vote to impose it." And category four would include "those people who feel that they could keep an open mind, who would consider the evidence that was presented, who would weigh the mitigating factors that might be presented against the aggravated factors which might be presented and who could then make a decision."

Prospective Juror No. 3 placed herself in category three: Although she accepted the theory of the death penalty, she could not personally impose it because she "wouldn't want to feel guilty."

The trial court asked the parties if they would be willing to stipulate to the excusal for cause of Prospective Juror No. 3. Defense counsel did not stipulate or object, but submitted the matter to the court. We have held the failure to object does not forfeit a claim raised on appeal pursuant to *Wainwright v. Witt*, *supra*, 469 U.S. 412, and *Witherspoon v. Illinois*, *supra*, 391 U.S. 510, although it suggests counsel concurred in the assessment the juror was excusable. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 262.)

Prospective Juror No. 3, although initially indicating she would not automatically vote for either life without the possibility of parole or the death penalty, but would consider all the evidence and vote her conscience, thereafter stated on examination during voir dire that she would never vote for the death penalty because she would not want to feel guilty. The record thus supports the trial court's conclusion that Prospective Juror No. 3 held views that would prevent or substantially impair her ability to impartially apply the law in accordance with the court's instructions. We find no error in the court's decision to excuse her for cause.

**Claim III. Refusal to Excuse for Cause Prospective Juror No. 8**

Defendant claims the court erred in denying his motion to excuse for cause Prospective Juror No. 8. He argues the prospective juror's views, as expressed in the juror questionnaire and voir dire examination, revealed a bias in favor of the death penalty.

In his questionnaire, Prospective Juror No. 8 indicated that he strongly supported the death penalty, thought it "never should have been repealed" and

16

"murderers should never have another opportunity to kill again." He thought the murder of an inmate was a less serious crime than the murder of a noninmate, but the fact the victim was an inmate who was a child molester would not prevent him from voting for the death penalty.

He also indicated he could see himself, in the appropriate situation, finding life in prison to be an appropriate punishment, and rejecting the death penalty. He would not automatically vote for either life without the possibility of parole or the death penalty, but would consider all the evidence and vote his conscience.

The court initially concluded, based on the questionnaire alone, that Prospective Juror No. 8 was not qualified to sit as a juror because his answers indicated he would not engage in a weighing of the evidence and, because defendant had prior convictions for murder, would automatically vote for the death penalty. When the prosecutor refused to stipulate to his excusal for cause, voir dire commenced. Prospective Juror No. 8 stated that he understood "the legal concept and how the death penalty should be imposed." But he did not "happen to personally agree with the way it works. But . . . [he would] follow the directions of the Court on how to impose a penalty as determined by law." If he learned that defendant had been convicted of a prior murder, he would not automatically vote for the death penalty, but "would wonder why that person had the opportunity." He would not "let [his] personal judgment interfere with [his] following the letter of the law." He would consider everything and follow the judge's directions, and his personal opinions would not interfere with his ability to give defendant a fair and impartial judgment.

Defense counsel then asked, "If you were Mr. Bivert, would you feel comfortable having a juror like yourself being on the jury?" Prospective Juror No. 8 suggested that, in light of his strong views in favor of the death penalty, if he were defendant "he wouldn't want to take a chance on me being on this jury. At

17

least I hope he wouldn't." He repeated, however, that although he strongly favored the death penalty, it "doesn't mean I would automatically go for it."

The defense thereafter challenged Prospective Juror No. 8 for cause. The court denied the motion, stating: "It's very clear that juror number 8 personally strongly supports the death penalty, but he also was very clear in stating that despite his personal opinion, he would follow the law in the case and he placed himself in category four [one who could keep an open mind, consider the evidence presented, weigh the mitigating factors against the aggravating factors, and then make a decision]. He never placed himself in category two [one who strongly supports the death penalty and would always vote for the death penalty no matter the evidence]. In other words, he never said that he would vote for the death penalty in all circumstances. There was a concern as to the prior murder and his statement regarding persons convicted of murder. However, that was asked of him and he stated that he would follow the law. Essentially, no matter what the special circumstance was, he would follow the law."

Defendant thereafter used one of his peremptory challenges to excuse Prospective Juror No. 8 and exhausted his peremptory challenges. At no time did he express any dissatisfaction with the jury panel as sworn.

This court recently explained in *People v. Mills* (2010) 48 Cal.4th 158, 186, that "[a]s a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel . . . must express to the trial court dissatisfaction with the

18

jury as presently constituted."  Here, defendant satisfied the first two of these requirements, but not the third.

Defendant argues that counsel may have failed to express dissatisfaction with the panel as sworn because he was "concerned that, if the juror selection process continued, a juror even worse than Juror No. 8 may have been seated."  He argues he should not be precluded from asserting on appeal " 'the deprivation of . . . fundamental, constitutional rights.' "  He fails to show, however, which fundamental constitutional rights would be implicated had he objected to the jury as sworn and a "worse juror" for the defense been seated.

We have acknowledged that an expression of dissatisfaction with the jury panel as sworn is required to preserve this issue for appeal, but have noted that in light of arguably conflicting language in *People v. Bittaker* (1989) 48 Cal.3d 1046, 1087-1088 (which suggests that an express statement of dissatisfaction is unnecessary if a defendant exhausts his or her peremptory challenges) and *People v. Crittenden* (1994) 9 Cal.4th 83, 121, footnote 4 (which clarified that an expression of dissatisfaction is in fact required), we would decline to apply this rule to cases tried before 1994, when *Crittenden* was decided.  (*People v. Mills*, *supra*, 48 Cal.4th at pp. 186-187.)  Because defendant was tried in 2001, the requirement of an express statement of dissatisfaction applies to his case, and thus he has not preserved this issue for appeal.

Had the issue been preserved, defendant's claim would nonetheless fail.  As set forth in the preceding claim, the federal constitutional standard for dismissing a prospective juror for cause based on his or her views of capital punishment is whether the juror's views " ' "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath.'  [Citations.]"  (*People v. Wilson*, *supra*, 44 Cal.4th at p. 779.)  " 'If the prospective juror's statements are conflicting or

19

equivocal, the court's determination of the actual state of mind is binding. If the statements are consistent, the court's ruling will be upheld if supported by substantial evidence.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 733.)

The trial court did not err in denying defendant's challenge for cause to Prospective Juror No. 8. He initially indicated he strongly supported the death penalty and believed that if a defendant murdered an inmate it was not as heinous a crime as if he had murdered a noninmate, but even if the victim was an inmate child molester, he would have no problem voting for the death penalty. Prospective Juror No. 8 also stated that if his and defendant's roles were switched, in light of his strong views on the death penalty, he would not want to have a juror like himself sitting in judgment. Nevertheless, as strong as were his statements in support of the death penalty, the record supports the determination that Prospective Juror No. 8 did not express an unalterable preference for the death penalty. He consistently said that in spite of his strong views, he would follow the law as instructed by the court, and under the appropriate circumstances, he could vote for life imprisonment without the possibility of parole over the death penalty. He would commit to following the law, would not let his personal views interfere with "the letter of the law," and would weigh the mitigating and aggravating factors before making a decision. He would not "automatically go for it."

The record thus supports the trial court's finding that Prospective Juror No. 8's views would not substantially impair the performance of his duties as a juror. The court did not err in denying defendant's motion to dismiss Prospective Juror No. 8 for cause.

### Claim IV.  Introduction of Evidence That Defendant Was a White Supremacist

Defendant next argues the court erred in admitting evidence he was a White supremacist and a racist.

20

Before trial, defendant moved to exclude evidence regarding White supremacist philosophies, any racially oriented or White supremacist material found in his possession in prison, or racially oriented statements made by him. He argued that because both he and his victims were White, the charged offenses were not racially motivated and any such evidence was irrelevant and would be more prejudicial than probative. (Evid. Code, § 352.)

The trial court ruled that evidence regarding White supremacist philosophies generally would not be admitted, but evidence of defendant's statements regarding the assault of Rick Dixon, the murder of Leonard Swartz, and the events leading up to the crimes, including statements regarding his motives, which might include elements of racism and White supremacist philosophies, would be admissible.

Defendant argues the court erred in admitting the following evidence: defendant was in charge of "the woods," or White inmates, in building B at SVSP and "assigned to himself" the duty to "clean up the trash that White people let slide these days"; defendant thought the White race had "gotten soft over the years and people like Swartz" would have to be "dealt with"; defendant told inmate C his "mission in prison was to take care of scum like Swartz"; defendant could not understand "why the White race was allowing Swartz to live"; defendant thought it was the responsibility of White people to "take care of" child molesters; defendant told inmate P he was targeting child molesters, Blacks, and "rats," and the gene pool should be cleansed of all persons with any kind of defect, a "sort of Hitler concept"; defendant told Dixon that in order to earn the respect of "the woods" in the building, Dixon would have to stab inmate Dennis, who had purchased drugs from an inmate of another race; Dixon refused to stab Dennis; defendant wanted to beat a Muslim to death; and the prison population was self-

21

segregated by race, and each race was responsible for dealing with its own "rats" or pedophiles.

Defendant argues that any motivation he may have had to commit the charged offenses was limited to his desire to kill child molesters, that evidence of his desire to kill child molesters was not evidence he was a racist, and that any evidence showing him to be a racist was irrelevant, inflammatory, and prejudicial. He argues that evidence creating the image of him as a White racist permeated the prosecution's case, skewed the jury's decisionmaking process to his detriment, and should not have been admitted.

"Only relevant evidence is admissible (Evid. Code, §350; [citations]), and, except as otherwise provided by statute, all relevant evidence is admissible[.] (Evid. Code, § 351; see also Cal. Const., art. I, § 28, subd. (d).)" (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 132.) "Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive. [Citations.]" (*People v. Garceau* (1993) 6 Cal.4th 140, 177.)

Defendant placed all material issues in dispute by pleading not guilty. (See *People v. Roldan* (2005) 35 Cal.4th 646, 705-706.) The evidence that defendant was in charge of an association of White inmates at SVSP, that he assigned duties to himself and others, and that the duties included actions designed to effectuate his desire to "clean up" the White race by eliminating child molesters and to punish White inmates who associated with inmates of other races, was relevant in the guilt phase of trial. This evidence tended logically to prove defendant harbored the intent and motive to assault Dixon for not obeying his commands, to assault Dennis because he purchased drugs from an inmate of another race, and to

22

kill Swartz for being a child molester. It also tended to prove defendant's prior attitude toward the victims, which was a relevant factor in determining whether his actions were deliberate and premeditated. (See *People v. Quartermain* (1997) 16 Cal.4th 600, 628.) That this evidence also revealed defendant to be a racist did not render it inadmissible. Evidence tending to prove defendant was a eugenicist who favored the supposed purity of the White race also tended to prove his motive and intent to assault and kill individuals he deemed to be acting in ways contrary to his ideal.

The court, therefore, did not err in admitting evidence that tended to show defendant was a White supremacist and a racist.

For the first time on appeal, defendant raises the claim that the trial court's ruling violated his rights under the First Amendment to the United States Constitution. Assuming the claim was properly preserved for appeal (see *People v. Boyer*, *supra*, 38 Cal.4th at p. 441), it fails on the merits.

Defendant argues that evidence of his membership in an association of White inmates allowed the prosecution to imply he was evil. This evidence served only to inflame the passions of the jury, he asserts, and resulted in a fundamentally unfair trial. He relies on *Dawson v. Delaware* (1992) 503 U.S. 159, in which the United States Supreme Court found constitutional error in the admission of a stipulation that proved inmate Dawson was a member of the Aryan Brotherhood prison gang and that the gang held White racist beliefs. In that case, the murder did not involve any elements of racial hatred. The court held that because the murder was not shown to be tied in any way to the Aryan Brotherhood, evidence of Dawson's membership invited the jury to draw inferences that tended to prove nothing more than his abstract beliefs, which were protected by the First Amendment. (*Id*. at pp. 166-167.)

23

In contrast, evidence of defendant's membership in "the woods" and his beliefs regarding the superiority of his race tended to prove more than his associations and abstract beliefs; its relevance lay in the circumstance that it tended to establish his motives and mens rea for the assault on Dixon and the murder of Swartz. The high court in *Dawson v. Delaware*, *supra*, 503 U.S. at page 165, was careful to note that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Because evidence of defendant's associations and statements regarding race was relevant to issues in question, it was not made inadmissible merely by the fact it was also protected by the First Amendment. The court, therefore, did not violate defendant's First Amendment rights by admitting evidence of his prison membership in an association of White supremacists.

Finally, defendant argues the admission of evidence of his White supremacist ideas violated his right to due process and a fair trial because it was irrelevant, inflammatory, and prejudicial. Assuming the claim was properly preserved for appeal (see *People v. Boyer*, *supra*, 38 Cal.4th at p. 441), it fails on the merits.

" ' "[I]rrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response should be curtailed." ' [Citation.]" (*People v. Harris* (2005) 37 Cal.4th 310, 351.) "Such evidence violates the Fourteenth Amendment's due process clause when it is so unduly prejudicial that it renders the trial fundamentally unfair." (*Ibid.*) The evidence challenged here revealed defendant's ideas about the White race and was relevant to his motives to commit, and his mens rea in committing, the charged offenses. It was relatively tame in nature, was limited to his philosophy rather than any conduct in conformity with it, and did not include general White

24

supremacist rhetoric.  Although it may have been disturbing to hear, evidence that defendant thought the "gene pool should be cleansed," that his mission was to "take care of scum" like Swartz, and that each race was responsible for "dealing with its own rats or pedophiles" was not so inflammatory as to divert the jury's attention or invite an irrational response.  The admission of this evidence did not violate defendant's constitutional rights to due process or a fair trial.

### Claim V.  Instructional Error—CALJIC No. 3.20

At defendant's request, or with his acquiescence, the trial court instructed the jury with CALJIC No. 3.20, a cautionary instruction regarding in-custody informant witnesses.  That instruction adopts the statutory language of section 1127a[7] and informs the jury that it should view with caution and close scrutiny the

---

[7]    Section 1127a provides:  "(a) As used in this section, an 'in-custody informant' means a person, other than a codefendant, percipient witness, accomplice, or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution.  [¶] (b) In any criminal trial or proceeding in which an in-custody informant testifies as a witness, upon the request of a party, the court shall instruct the jury as follows:  [¶] 'The testimony of an in-custody informant should be viewed with caution and close scrutiny.  In evaluating such testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness.  This does not mean that you may arbitrarily disregard such testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in the case.'  [¶] (c) When the prosecution calls an in-custody informant as a witness in any criminal trial, contemporaneous with the calling of that witness, the prosecution shall file with the court a written statement setting out any and all consideration promised to, or received by, the in-custody informant.  [¶] The statement filed with the court shall not expand or limit the defendant's right to discover information that is otherwise provided by law.  The statement shall be provided to the defendant or the defendant's attorney prior to trial and the information contained in the statement shall be subject to rules of evidence.  [¶] (d) For purposes of subdivision (c), 'consideration' means any plea bargain, bail consideration, reduction or modification of sentence, or any other leniency,

*(footnote continued on next page)*

25

testimony of an "in-custody informant," defined as a person "whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within the correctional institution." (§ 1127a, subd. (a); CALJIC No. 3.20.) Specifically excluded from the statutory definition of "in-custody informant" are codefendants, percipient witnesses, accomplices, or coconspirators. (*Ibid.*) The trial court identified inmates C, D, J, P, and R[8] as in-custody informants, and SVSP, Corcoran State Prison, and Pelican Bay State Prison as correctional institutions.

Defendant argues the court erred in refusing his request to amend the cautionary instruction to include in-custody percipient witnesses inmates A, F, and G.[9] He invokes the legal maxim *inclusio unius est exclusio alterius* (the inclusion

---

*(footnote continued from previous page)*

benefit, immunity, financial assistance, reward, or amelioration of current or future conditions of incarceration in return for, or in connection with, the informant's testimony in the criminal proceeding in which the prosecutor intends to call him or her as a witness."

[8]     Inmate C testified he lived in the cell directly beneath that of defendant at SVSP, and prior to the attack on Swartz he heard scraping sounds coming from defendant's cell.

Inmate D testified he spoke with defendant following defendant's return to SVSP after his attack on Dixon.

Inmate J, defendant's cellmate at Corcoran State Prison where defendant was sent immediately following the attack on Swartz, testified to statements defendant made regarding both attacks.

Inmate P, defendant's cellmate at Pelican Bay State Prison, testified to defendant's desire to cleanse the White race and defendant's statements regarding how he had stabbed Swartz.

Inmate R met defendant at Pelican Bay State Prison and testified to statements defendant had made regarding both attacks.

[9]     Inmate A testified that moments before the fatal attack he was playing dominoes with Swartz, and he saw and heard the attack as it happened.

Inmate F testified he was on the second tier at the time of the attack on Swartz, and he heard and saw the attack as it happened.

*(footnote continued on next page)*

26

of one is the exclusion of another) (see *Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829) to argue that by specifically limiting the application of the cautionary instruction to inmates C, D, J, P, and R, the court implied that the testimony of in-custody percipient witnesses inmates A, F, and G was to be viewed as more credible, less in need of caution or close scrutiny, and therefore more worthy of belief. He asserts the court, by limiting the cautionary instruction to the in-custody *informant* witnesses, improperly enhanced the testimony of the in-custody *percipient* witnesses, thereby depriving him of his right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution. Assuming this claim was properly preserved for appeal (see *People v. Boyer*, *supra*, 38 Cal.4th at p. 441), it lacks merit.

" '[T]he trial court normally must, even in the absence of a request, instruct on general principles of law that are closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' [Citation.] In addition, 'a defendant has a right to an instruction that pinpoints the theory of the defense . . . .' " (*People v. Roldan*, *supra*, 35 Cal.4th at p. 715.) The court, however, " may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].'" (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

An examination of the legislative history of section 1127a, which was enacted in 1989 and formed the basis for cautionary instruction CALJIC No. 3.20,

---

*(footnote continued from previous page)*

Inmate G testified he saw and heard the attack on Swartz as it happened, and he saw defendant shake while being searched.

reveals the Legislature made a deliberate and rational distinction between in-custody *percipient* witnesses and in-custody *informant* witnesses. The Legislature acted in response to a highly publicized case in Los Angeles in which a jailhouse informant, through nefarious means and by posing on the jailhouse telephone as an investigator, convinced law enforcement officers and investigators that he was in legitimate need of confidentially held information about an ongoing criminal case. He later used this information to testify falsely to having heard a "confession" of the defendant in the ongoing case, and received favorable treatment in his own case in exchange for his testimony. The Legislature recognized that in-custody informant witnesses differ in nature and character from in-custody percipient witnesses. Section 1127a and CALJIC No. 3.20 specifically distinguish between the two. In-custody informant witnesses have no personal knowledge of the crime, but testify that a defendant made an inculpatory statement to them while in proximity in a county jail or state prison, often in exchange for favorable treatment by law enforcement. In-custody percipient witnesses, by contrast, like other percipient witnesses, codefendants, accomplices, and coconspirators, testify on the basis of personal knowledge of the crime. In-custody informant witnesses testify to a defendant's confession of guilt or admission of criminal behavior, and such evidence, if believed, carries great weight in the determination of guilt. In order to lessen the possibility of any conviction being based on fabricated testimony, the Legislature offered additional guidance to juries in criminal cases involving in-custody informants. (See Assem. Com. on Public Safety, coms. on Assem. Bill No. 278 (1989-1990 Reg. Sess.), 3d reading, as amended June 12, 1989.) Defendant's proposed amendment to CALJIC No. 3.20 erased the distinctions recognized by the Legislature and, hence, was properly refused by the trial court.

The trial court instructed the jury with CALJIC No. 2.20, which provides that, in judging any witness's credibility, the jury was to consider, inter alia,

28

"anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to . . . [¶] The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified; [¶] The ability of the witness to remember or to communicate any matter about which the witness has testified; [¶] The character and quality of that testimony; [¶] The demeanor and manner of the witness while testifying; [¶] The existence or nonexistence of a bias, interest, or other motive; [¶] The existence or nonexistence of any fact testified to by the witness; [¶] The attitude of the witness toward this action or toward the giving of testimony; [¶] A statement previously made by the witness that is consistent or inconsistent with his or her testimony; [¶] . . . [¶] [and] "The witness' prior conviction of a felony. . . ."

The court also instructed with CALJIC No. 2.23, which informs the jury that "[t]he fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may consider in weighing the testimony of that witness."

Thus, the jury was adequately instructed on factors that might have affected the strength and credibility of the percipient witnesses' testimony. Defendant cites no legal authority or factual support for the proposition that the instructions encouraged the jurors to give the testimony of the percipient witnesses special credence or weight, and we find none.

29

**Claim VI.  Defendant's Death Sentence Is Cruel and Unusual Punishment Because It Is Based Primarily on Prior Murders Committed When He Was a Juvenile**

Section 190.3, factor (b) provides that, in determining whether to sentence defendant to death or life imprisonment without the possibility of parole, the jury may consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."  We have long held that prior violent conduct committed while defendant was a juvenile may be admitted as evidence of criminal activity that involved the use or attempted use of force or violence. (*People v. Roldan*, *supra*, 35 Cal.4th at p. 737.)  We have further explained that the decision of the United States Supreme Court in *Roper v. Simmons* (2005) 543 U.S. 551, which held that the Eighth Amendment's prohibition against cruel and unusual punishment precludes execution of an individual who committed capital crimes while under the age of 18 years, says nothing about the propriety of permitting a capital sentencing jury, trying an adult defendant, to consider the defendant's prior violent conduct committed as a juvenile.  (*People v. Lee* (2011) 51 Cal.4th 620, 648-649; *People v. Taylor* (2010) 48 Cal.4th 574, 653-654; *People v. Bramit* (2009) 46 Cal.4th 1221, 1239.)

Defendant contends his case differs from the previous cases in which we found no error in the consideration of prior juvenile violent conduct.  Unlike *People v. Lee*, *supra*, 51 Cal.4th at pages 648-649, which involved assault, battery, and robbery, *People v. Taylor*, *supra*, 48 Cal.4th at pages 653-654, which involved sexual assault, and *People v. Bramit*, *supra*, 46 Cal.4th at page 1239, which involved robbery and assault, defendant's prior juvenile violent conduct involved three brutal, unprovoked murders.  But this difference does not compel us to reconsider our prior decisions in favor of a rule in which no prior juvenile conduct is admissible in the penalty phase of a capital trial.  As we have previously noted,

*Roper v. Simmons*, *supra*, 543 U.S. 551, spoke only to the question of punishment for juvenile offenses, while defendant's challenge "is to the admissibility of evidence, not the imposition of punishment." (*Bramit*, at p. 1239.) That the juvenile conduct here was more severe than the juvenile conduct at issue in our prior cases does not alter this conclusion.

Defendant further asserts it was primarily because of his three prior murders, rather than his having murdered a convicted child molester in prison, that the jury returned a verdict of death after less than one and one-half hours of deliberation. On this ground as well, he urges this court to reconsider our reading of *Roper v. Simmons*, *supra*, 543 U.S. 551, and hold that here, where the prior juvenile violent conduct is (assertedly) more heinous than the capital offense, the juvenile conduct should not be admissible as a factor in aggravation.

Defendant's argument is both speculative and unpersuasive. As a formal matter, contrary to defendant's assertions, the death sentence imposed was for his commission, as an adult, of the capital offense of the first degree murder of Leonard Swartz, with special circumstances of lying in wait and prior first degree murder. Evidence of the three murders committed while a juvenile was, pursuant to section 190.3, factor (b), introduced in aggravation to "enable the jury to make an individualized assessment of the character and history of . . . defendant to determine the nature of the punishment to be imposed." (*People v. Grant* (1988) 45 Cal.3d 829, 851.) In their determination of the appropriate punishment, the jury could properly consider defendant's commission of three prior murders.

Without any evidence the jurors' sentencing decision was more influenced by defendant's prior violent conduct than by the capital offense, defendant's claim is purely speculative. The jurors may well have regarded the capital crime itself— the premeditated, unprovoked killing of a fellow inmate by a life prisoner—as egregious enough to warrant the death penalty. Moreover, any attempt to ground

31

the claim in evidence of the jurors' subjective reasoning processes would violate Evidence Code section 1150. (*People v. Collins* (2010) 49 Cal.4th 175, 250.) Defendant has not established that the use in aggravation of three prior murders he committed as a juvenile rendered his death sentence for the charged in-prison murder unconstitutional.

### Claim VII. California's Death Penalty Statute Is Unconstitutional

Defendant raises a number of facial constitutional challenges to California's death penalty law, claims we have repeatedly rejected and find no persuasive reason to reexamine.

As we recently observed in *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 208, " '[W]e reiterate that the death penalty statutes adequately narrow the class of murderers eligible for the death penalty, are not impermissibly vague or overbroad, and do not result in an "arbitrary and capricious" or "wanton and freakish" penalty determination. [We] also have held that the statutes do not require that the prosecution carry the burden of proof or persuasion at the penalty phase, that the jury make written findings or reach unanimous decisions regarding aggravating factors, or that the jury find beyond a reasonable doubt that (1) the aggravating factors have been proved, (2) the aggravating factors outweigh the mitigating factors, or (3) death is the appropriate sentence.' " "The United States Supreme Court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (*Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]; *United States v. Booker* (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738]; *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; *Apprendi v. New Jersey* [(2000)] 530 U.S. 466) have not altered our conclusions in this regard." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 227.)

" 'There is no violation of the equal protection of the laws as a result of the statutes' asserted failure to provide for capital defendants some procedural guarantees afforded to noncapital defendants.' " (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 208.)

Further, "[t]he statutes are not invalid because they permit the jury to consider in aggravation, under section 190.3, factor (b), evidence of a defendant's unadjudicated offenses." (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 208.) " 'The use in the statutes, and in the standard jury instructions, of terms such as "extreme," "substantial," "reasonably believed," and "at the time of the offense" in setting forth the mitigating factors does not impermissibly limit the mitigation evidence or otherwise result in an arbitrary or capricious penalty determination. The statutes, as translated into those standard jury instructions, adequately and properly describe the process by which the jury is to reach its penalty determination. There is no need to instruct the jury at the penalty phase (1) regarding a burden of proof, except as to section 190.3, factors (b) and (c), or the absence of a burden of proof, (2) regarding the meaning of the term "mitigation," (3) that mitigating factors can be considered only in mitigation, (4) that if the mitigating evidence outweighs the aggravating evidence, the jury must impose a sentence of life without the possibility of parole, or (5) that the jury is not required to impose the death penalty even if it finds the aggravating evidence outweighs the mitigating evidence. The trial court need not omit from the instructions any mitigating factors that appear not to apply to the defendant's case.' [Citation.] [¶] 'There is no requirement that the trial court or this court engage in intercase proportionality review when examining a death verdict. A sentence of death that comports with state and federal statutory and constitutional law does not violate international law or norms . . . .' " (*Id.* at pp. 208-209.)

## III. Disposition

The judgment of the superior court is affirmed.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**CHIN, J.**
**CORRIGAN, J.**
**HAERLE, J.**[*]

---

[*] Associate Justice, Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Bivert

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S099414
**Date Filed:** July 11, 2011

_____

**Court:** Superior
**County:** Monterey
**Judge:** Wendy C. Duffy


_____

**Counsel:**

Warren P. Robinson, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Glenn R. Pruden and Alice B. Lustre, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Warren P. Robinson,
15412 Caldas De Reyes
San Diego, CA  92128-4456
(858) 395-5027

Alice B. Lustre
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-1167