Filed 6/20/13  P. v. Espiritu CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. THOMAS REYES ESPIRITU, Defendant and Appellant. | D061931 (Super. Ct. No. SCE307352) |


APPEAL from a judgment of the Superior Court of San Diego County, Joseph P. Brannigan, Judge.  Affirmed in part, reversed in part, and modified in part.


Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie F. Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Thomas Reyes Espiritu of gross vehicular manslaughter while intoxicated (Pen. Code,[1] § 191.5, subd. (a); count 1), driving under the influence causing injury (Veh. Code, § 23153, subd. (a); count 2), and driving with a measurable blood alcohol level causing injury (Veh. Code, § 23153, subd. (b); count 3). As to counts 2 and 3, the jury also found true allegations Espiritu had a blood alcohol concentration of 0.15 percent or more (Veh. Code, § 23578) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The court sentenced Espiritu to six years in state prison for count 1 and, at the parties' request, stayed the convictions for counts 2 and 3 under section 654. The court additionally awarded him 200 days of presentence credit, consisting of 134 actual days and 66 conduct days under section 4019.

Espiritu appeals, contending the court prejudicially erred by admitting an irrelevant and unduly inflammatory autopsy photograph, admitting irrelevant and unsupported expert accident reconstruction testimony, excluding relevant evidence of the victim's narcotics use, and refusing to give a requested pinpoint instruction on the definition of gross negligence. Additionally, he contends the cumulative prejudicial impact of these errors deprived him of due process and a fair trial. He also contends we must reverse his convictions for counts 2 and 3 because they are lesser included offenses

---

[1]     Further statutory references are to the Penal Code unless otherwise stated.

of count 1, and he is entitled to additional presentence conduct credit under the current version of section 4019.

The People concede and we agree we must reverse his convictions for counts 2 and 3. In all other respects, we affirm the judgment.

BACKGROUND

On an evening in December 2010, Espiritu and his fiancée attended a Christmas party where Espiritu drank vodka and whiskey. After the party, Espiritu's fiancé, who had not been drinking, drove them to her home. About 15 minutes after they arrived, Espiritu left in his vehicle to pick up his daughter. At trial, Espiritu's fiancée testified she did not think he was too impaired to drive; however, that night she told a police officer the opposite.

Sometime after leaving his fiancée's home, Espiritu passed a car in which Jeffrey Smith was a passenger. Smith saw Espiritu weave in and out of traffic and estimated Espiritu was driving at least 70 miles per hour. Espiritu's car was moving so fast it had a body roll and its tires were folding under it. After Espiritu passed Smith, Smith lost sight of Espiritu's car. About a minute later and a mile or two down the road, Smith saw debris in the roadway and a body lying in the center of the road. He also saw Espiritu's now damaged car a bit farther ahead.

A community service officer who responded to the scene asked Espiritu if he had been in a accident with a motorcycle. Espiritu did not respond. When the officer asked him again whether he had been in an accident, Espiritu told him a motorcycle had committed a hit and run. A bystander then informed the officer a motorcycle and rider

3

were down. The officer went to where the rider, David Dickinson, was lying on the ground. Dickinson was alive, but nonresponsive.

Dickinson later died at the hospital. The medical examiner noted he had scrapes and bruising around his face and bleeding around his brain. His brain had swelled, his spinal cord was bruised, and his neck, the base of his skull, and two locations along his spine were fractured. He also had a scrape across his abdomen and chest, multiple rib fractures, and multiple organ injuries. He died from multiple blunt force injuries.

A police officer with expertise in conducting driving under the influence (DUI) evaluations noticed Espiritu smelled of alcohol, had bloodshot and watery eyes, slurred speech, and an unsteady gait. The officer performed a series of field sobriety tests on Espiritu. The officer also had Espiritu blow into a preliminary alcohol screening device two times. The first time produced a reading of 0.169 percent blood alcohol content and the second time produced a reading of 0.166 percent blood alcohol content. Based on the results of the field sobriety tests and the preliminary alcohol screening, the officer formed the opinion Espiritu was under the influence of alcohol, arrested him, and transported him to the police station.

At the station, the officer administered two breath tests to Espiritu, which produced readings of 0.15 percent blood alcohol content and 0.16 percent blood alcohol content. The officer also had Espiritu's blood drawn.

A criminalist performed two tests on the blood drawn from Espiritu. The first test showed he had a blood alcohol content of 0.135 percent and the second showed he had a blood alcohol content of 0.136 percent. From the results of the breath and blood tests, the

4

criminalist calculated Espiritu's blood alcohol content at the time of the collision was between 0.15 and 0.17 percent. According to the criminalist, a person with a 0.15 blood alcohol content level would have pronounced physical and mental impairments. Based on the results of the scientific tests, the field sobriety tests, and Espiritu's reported driving behavior, the criminalist opined he was under the influence at the time of the collision.

A tow truck operator drove up to the scene, noticed Dickinson's motorcycle lying on its side, and picked it up and put it on its stand. The tow truck operator noticed the rear wheel of the motorcycle was heavily damaged.

A motorcycle maintenance expert subsequently inspected Dickinson's motorcycle. The right side of the motorcycle was heavily damaged. The rear was also heavily damaged from what appeared to be a very large, direct impact. At the time of the collision, the motorcycle was in third gear. In third gear, the motorcycle can go between 20 and 70 miles per hour, with a comfortable cruising speed of 30 to 45 miles per hour.

The right side of the motorcycle's engine had grind marks indicating the engine had slid on the ground for a time. There was plastic imbedded in the motorcycle's muffler. An officer opined the plastic came from the headlight housing on Espiritu's vehicle.

An accident reconstruction expert studied the data from the event data recorder in Espiritu's car. The expert determined the vehicle was going between 86 to 95 miles per hour in the period between 4.3 and 2.3 seconds before the impact. Immediately before the impact, the car's speed dropped to between 76 and 85 miles per hour as Espiritu took his foot off the accelerator and stepped on the brake pedal. There was no evidence, such

5

as skids marks, indicating either Espiritu's car or the motorcycle were braking hard at the time of the collision.

Based on the presence of corresponding impact scuff marks, El Cajon police officer and traffic collision investigator Joshua Pittsley opined the back of Dickinson's helmet had impacted the "A" pillar of Espiritu's vehicle. Additionally, the front tire of Espiritu's car was pushed back into the wheel well to the point the tire would not roll, and the entire front end of the vehicle was collapsed two to three feet. Espiritu's vehicle also impacted a curb.

The officer opined Espiritu had been trying to flatten out a corner turn when his car drifted out of the right lane, straddled the right and left lanes, and struck the rear of Dickinson's motorcycle, which was traveling in the right third of the left lane. The impact carried Dickinson on Espiritu's vehicle for 120 feet before Dickinson slid another 57 feet to the ground. Dickinson's motorcycle was carried 360 feet on Espiritu's vehicle before it slid to the ground and eventually ended up 414 feet from the point of impact. Espiritu's vehicle ended up 735 feet from the point of impact.

## DISCUSSION

### I

*Admission of Autopsy Photograph*

#### A

Before trial, the prosecutor sought admission of a single autopsy photograph of Dickinson's face showing abrasions and bruising on his forehead, left eye, nose, upper lip, lip, chin, and left cheek. The prosecutor argued the photograph was admissible

because it corroborated the medical examiner's testimony, illustrated the nature of Dickinson's injuries, and supported the theory Espiritu's unreasonable speed launched Dickinson 177 feet.

Defense counsel objected to the admission of the photograph under Evidence Code section 352, arguing neither Dickinson's identity nor the fact of his death were at issue and viewing the photograph would be upsetting to a layperson. After viewing the photograph, the court found it was relevant and its prejudicial effect did not outweigh its probative value.

B

1

Espiritu contends the court prejudicially erred in admitting the autopsy photograph. To evaluate the merit to this contention, we first consider whether the trial court abused its discretion in determining the photograph was relevant. (*People v. Ramirez* (2006) 39 Cal.4th 398, 453; *People v. Carter* (2005) 36 Cal.4th 1114, 1166.) " ' "Relevant evidence" means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.)" (*People v. Ramirez*, *supra*, at p. 453.) " ' "The test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' " (*People v. Carter*, *supra*, at p. 1166.)

In this case, the prosecutor had to prove Espiritu acted with gross negligence resulting in the death of another. To meet this burden, the prosecutor presented accident

7

reconstruction evidence indicating Espiritu collided with the rear of Dickinson's motorcycle at a high rate of speed, causing Dickinson to be thrown from his motorcycle and slide across the roadway before coming to rest 177 feet from the point of impact. The medical examiner's testimony corroborated the accident reconstruction evidence and established the cause of Dickinson's death. The autopsy photograph also corroborated the accident reconstruction evidence and illustrated part of the medical examiner's testimony. Accordingly, the court did not abuse its discretion in determining the photograph was relevant. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1248 [photographs are relevant to illustrate a forensic expert's testimony]; *People v. Howard* (2010) 51 Cal.4th 15, 33 [autopsy photographs are admissible to clarify the testimony of prosecution witnesses regarding the crime scene and the autopsy].)

Although Espiritu contends the photograph was irrelevant because it was probative only of undisputed issues, "autopsy and crime scene photographs are not made inadmissible because they are offered to prove an issue not in dispute." (*People v. Watson* (2008) 43 Cal.4th 652, 684; *People v. Crittenden* (1994) 9 Cal.4th 83, 132-133.) Moreover, even if the photograph was cumulative to the testimonial evidence, " 'this . . . does not demonstrate the trial court abused its broad discretion. "[P]rosecutors . . . are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case." ' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 294; accord, *People v. Lewis* (2009) 46 Cal.4th 1255, 1282.)

8

We next consider whether the court abused its discretion in determining the probative value of the photograph outweighed its prejudicial effect. " 'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . .' [Citation.] 'The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors.' [Citation.] We review the trial court's ruling under Evidence Code section 352 for abuse of discretion [citation], and . . . will reverse a trial court's exercise of discretion to admit crime scene or autopsy photographs only when 'the probative value of the photographs clearly is outweighed by their prejudicial effect.' " (*People v. Watson*, *supra*, 43 Cal.4th at pp. 683-684; accord, *People v. McKinzie* (2012) 54 Cal.4th 1302, 1351.)

Admission of an autopsy photograph is only unduly prejudicial if the photograph " 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' " (*People v. Virgil* (2011) 51 Cal.4th 1210, 1248.) The photograph at issue here is a close-up of Dickinson's face with his eyes closed. The photograph has a yellow tinge and was taken as Dickinson's body lay on a metal table with a covering up to his chin. The photograph does not show any open or bleeding wounds. Of the bruises and abrasions shown, only one, a deep, dark red bruise on the tip of Dickinson's nose, stands out. While unquestionably

unpleasant, the photograph cannot be fairly characterized as sensational or unduly gruesome. We, therefore, cannot conclude the prejudicial effect of the photograph clearly outweighed its probative value such that the court abused its discretion in admitting it.

Even if the court had abused its discretion in admitting the photograph, the photograph did not provide the jury with any additional or more graphic information than the medical examiner's testimony. Thus, admission of the photograph was harmless under both *Chapman v. California* (1967) 386 U.S. 18, 24 and *People v. Watson* (1956) 46 Cal.2d 818, 836-837. (*People v. Cole* (2004) 33 Cal.4th 1158, 1199.)

II

*Admission of Accident Reconstruction Expert Testimony*

Espiritu contends the court erred by admitting Pittsley's expert accident reconstruction testimony because the testimony was based on two false premises: (1) Dickinson was an experienced motorcycle rider, and (2) Dickinson was sober at the time of the accident. We review a court's decision to admit expert testimony for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 45.)

"[A]n expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1008.) In this case, however, the record does not show Pittsley's trial testimony was based on unsupported assumptions.

10

Espiritu has not identified nor have we located any place in the record indicating Pittsley based his trial testimony on the assumption Dickinson was sober.[2]  In addition, while Pittsley testified experienced motorcycle riders tend to ride in a particular place in the roadway and he believed the collision occurred in this place, he did not base his belief on the assumption Dickinson was an experienced rider.  He acknowledged he did not know anything about Dickinson's experience or ability riding motorcycles.  Rather, he based his belief solely on the physical evidence at the collision scene.  Accordingly, Espiritu has not established the court abused its discretion in admitting Pittsley's testimony.  Given this conclusion, we need not address the People's assertion that Espiritu forfeited this contention by failing to object to Pittsley's testimony below.

III

*Exclusion of Evidence of Dickinson's Drug Use*

A

Before trial, defense counsel sought to admit and the prosecutor sought to exclude under Evidence Code section 352 evidence of Dickinson's narcotics use.  Defense counsel argued the court should allow admission of the evidence as it was relevant to

_____

[2]    At the preliminary hearing, during cross-examination by defense counsel, Pittsley testified the collision in this case was not consistent with the scenario of Dickinson's motorcycle having cut off Espiritu's car.  He based this opinion in part on the assumption Dickinson was maintaining his lane and a consistent speed at the time of the accident.  He acknowledged an intoxicated person would have a difficult time doing either.  He also acknowledged blood tests showed there were controlled substances in Dickinson's system at the time of the accident and there was a possibility Dickinson was impaired.  However, he further testified this information did not change his opinion that Dickinson was not at fault for the accident.

11

Dickinson's cause of death because methamphetamine use increases hemorrhaging, which caused him to bleed more and faster, leading to his death. The prosecutor responded that the medical examiner determined the cause of death to be multiple blunt force trauma, not methamphetamine use. The court found the evidence irrelevant and excluded it.

During trial, defense counsel renewed her request to admit evidence of Dickinson's narcotics use, arguing the evidence was necessary to counter Pittsley's assumption Dickinson was riding in the right third of the left lane at the time of the accident because that is what an experienced, sober motorcycle rider would do. In response, the prosecutor pointed out Pittsley's opinions had more to do with where the physical evidence placed Dickinson than with any assumption about the behavior of an experienced motorcycle rider. Therefore, the prosecutor argued admission of the evidence of Dickinson's narcotics use would be far more prejudicial than probative. The court agreed with the prosecutor's position, particularly absent the existence of any evidence indicating Dickinson was driving in an erratic manner before the collision, and reaffirmed its pretrial ruling excluding the evidence.

B

Espiritu contends the court prejudicially erred in excluding the evidence because its admission was necessary for him to counter Pittsley's assumption Dickinson was sober at the time of the accident. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

12

As we noted in part II, *ante*, nothing in the record indicates Pittsley based his opinions about how the collision occurred on the assumption Dickinson was sober. To the contrary, the record shows Pittsley knew Dickinson was possibly impaired at the time of the collision. Consequently, Espiritu has not established the evidence of Dickinson's narcotics use was probative, much less more probative than prejudicial, and we cannot conclude the court abused its discretion in excluding it.

IV

*Refusal of Pinpoint Gross Negligence Instruction*

A

To instruct the jury on the crime of gross vehicular manslaughter while intoxicated, the court used a tailored version of CALCRIM No. 590. The instruction informed the jury, "Gross negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] [and] [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] The combination of driving a vehicle while under the influence of an alcoholic beverage and violating a traffic law is not enough by itself to establish gross negligence. In evaluating whether the defendant acted with gross

13

negligence, consider the level of the defendant's intoxication, if any; the way the defendant drove; and any other relevant aspects of the defendant's conduct."

Defense counsel requested the court also give the jury a pinpoint instruction on the definition of gross negligence. The proposed instruction read: " 'Gross negligence' requires more than ordinary carelessness, inattention or mistake in judgment. [¶] 'Gross negligence' means conduct which is more than ordinary negligence. Ordinary negligence is the failure to exercise ordinary or reasonable care. [¶] 'Gross negligence' refers to a negligent act which is aggravated, reckless or flagrant and which is such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for danger to human life or to constitute indifference to the consequences of those acts. [¶] The facts must be such that the consequences of the negligent act could reasonably have been foreseen and it must appear that the death or danger to human life was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act."[3]

The prosecution objected to the pinpoint instruction, arguing the definition of gross negligence was adequately covered by CALCRIM No. 590 and the pinpoint instruction might confuse the jury. The court agreed CALCRIM No. 590 adequately covered the definition and declined to give the pinpoint instruction.

---

[3]     In his opening brief, Espiritu states the proposed pinpoint instruction was based on language in *People v. Penny* (1955) 44 Cal.2d 861, *People v. Bennett* (1991) 54 Cal.3d 1032, *People v. Costa* (1953) 40 Cal.2d 160, and CALJIC No. 3.36.

14

B

Espiritu contends the proposed pinpoint instruction expanded on CALCRIM No. 590 and clarified the distinction between ordinary and gross negligence by: (1) adding "aggravated" and "flagrant" to the definition, (2) requiring the consequences of the negligence to be reasonably foreseen, and (3) informing the jury gross negligence is "not the result of inattention, mistaken judgment or misadventure." As the pinpoint instruction supported his defense theory (i.e., he acted with ordinary negligence rather than gross negligence), he contends the court was obliged to give the instruction and prejudicially erred by refusing to do so.

The propriety of a decision to give or refuse any particular instruction in any particular case involves a mixed question of law and fact. As the question is a predominantly legal one, we independently review it. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Shaw* (2002) 97 Cal.App.4th 833, 838.)

" ' "[A] defendant has a right to an instruction that pinpoints the theory of the defense . . . ." ' [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*People v. Burney* (2009) 47 Cal.4th 203, 246; accord, *People v. Bivert* (2011) 52 Cal.4th 96, 120; *People v. Canizalez* (2011) 197 Cal.App.4th 832, 856–857.)

In this case, the pattern instruction the court used adequately covered each of the points for which Espiritu sought the pinpoint instruction. The pattern instruction conveyed the need for grossly negligent conduct to be "aggravated" and "flagrant" by

15

informing the jury the conduct had to create "a high risk of death or great bodily injury" and had to be "so different from the way an ordinarily careful person would act in the same situation" that it amounted to "disregard for human life or indifference to the consequences" of the conduct.  (CALCRIM No. 590.)  The pattern instruction conveyed the need for the consequences of the grossly negligent conduct to be reasonably foreseen by informing the jury "[a] person acts with gross negligence when:  [¶] . . . [¶]  [a] reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 590.)  Finally, the pattern instruction clarified that gross negligence is "not the result of inattention, mistaken judgment or misadventure" by informing the jury gross negligence "involves more than ordinary carelessness, inattention, or mistake in judgment."  (CALCRIM No. 590.)  A court is not required to give a pinpoint instruction on a matter adequately covered by another instruction.  (*People v. Clark* (2011) 52 Cal.4th 856, 975.)  Accordingly, we conclude the court did not err by failing to give Espiritu's requested pinpoint instruction on gross negligence.

Even if the court should have given a pinpoint instruction, the error was harmless. Defense counsel's closing argument fully presented the defense theory that Espiritu's conduct amounted to only ordinary negligence and nothing in the court's instructions precluded the jury from so finding.  (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144-1145.)

16

## V

### *Cumulative Error*

Espiritu contends we must reverse his convictions because the cumulative effect of the above claimed errors prejudiced him. We reject this argument as "[w]e have found no error that, either alone or in conjunction with others, prejudiced [him]." (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

## VI

### *Dismissal of Counts 2 and 3 as Lesser Included Offenses*

Espiritu contends, the People concede, and we agree we must reverse Espiritu's convictions for counts 2 and 3 because they are lesser included offenses of count 1. A defendant may not be convicted of both a greater and a lesser included offense. (*People v. Medina* (2007) 41 Cal.4th 685, 701.) Thus, when a jury finds a defendant guilty of both a greater and a lesser included offense and there is substantial evidence to support the conviction for the greater offense, the greater offense controls and the lesser included offense must be reversed. (*Id.* at pp. 701-702; *People v. Moran* (1970) 1 Cal.3d 755, 763.)

## VII

### *Custody Credits*

Espiritu was initially confined December 19, 2010, was released the same day, was confined again on January 11, 2011, and released on January 12, 2011, and was confined again on December 22, 2011. The court subsequently sentenced him on April 30, 2012. The court awarded him 200 days of presentence custody credit,

17

consisting of 134 days of actual custody credit and 66 days of conduct credit.  Based on amendments to section 4019, which took effect on October 1, 2011, Espiritu contends he is entitled to additional presentence conduct credit for the time he served after that date.  He further contends failure to award him additional presentence conduct credit for this time deprives him of equal protection of the law.  We disagree.

Section 4019, which specifies the rate of presentence conduct credit an inmate in local custody may earn, had undergone numerous revisions in the past several years.  (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48-50 (*Rajanayagam*) [detailing the history of recent amendments]; *People v. Garcia* (2012) 209 Cal.App.4th 530, 533-540 [same].)  At the time of Espiritu's offense, section 4019 allowed an inmate in local custody to earn up to six days of conduct credit for every four days of actual custody.  (Former § 4019, subds. (b), (c), & (f), Stats. 2010, ch. 426, § 2, eff. Sept. 28, 2010; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1549.)  As of October 1, 2011, section 4019 allows an inmate in local custody to earn up to four days of conduct credit for every two days of actual custody.  (Amended § 4019, subds. (b), (c), & (f), Stats. 2011, ch. 15, § 482, eff. Apr. 4, 2011, operative Oct. 1, 2011; Stats. 2011, ch. 39, § 53, eff. June 30, 2011, operative Oct. 1, 2011; Stats. 2011-2012, 1st Ex. Sess., ch. 12, § 35, eff. Sept. 21, 2011, operative Oct. 1, 2011; *People v. Ellis*, *supra*, at pp. 1549-1550.)

Of pertinence here, subdivision (h) of amended section 4019 states, "The changes to this section . . . shall apply prospectively and shall apply to prisoners who are confined to a county jail . . . for a crime committed on or after October 1, 2011.  Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior

18

law."  According to Espiritu, the latter sentence creates an ambiguity, which should be interpreted to allow him to earn credits for local time served after October 1, 2011, even though he committed his crime before then.

However, as the *Rajanayagam* court explained, "subdivision (h)'s first sentence reflects the Legislature intended the enhanced conduct credit provision to apply only to those defendants who committed their crimes on or after October 1, 2011.  Subdivision (h)'s second sentence does not extend the enhanced conduct credit provision to any other group, namely those defendants who committed offenses before October 1, 2011, but are in local custody on or after October 1, 2011.  Instead, subdivision (h)'s second sentence attempts to clarify that those defendant's who committed an offense before October 1, 2011, are to earn credit under the prior law.  However inartful the language of subdivision (h), we read the second sentence as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law.  [Citation.]  To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence."  (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 52, fn. omitted; see also, *People v. Ellis*, *supra*, 207 Cal.App.4th at p. 1553 ["The second sentence does not extend the enhanced rate to any other group, but merely specifies the rate at which all others are to earn conduct credits"]; *People v. Garcia*, *supra*, 209 Cal.App.4th at p. 541 [the language of amended section 4019 does

19

not entitle a defendant who was sentenced after its effective date but whose crimes occurred prior to its effective date to additional conduct credit].)

This interpretation and its application to Espiritu does not deprive him of equal protection of the law because, assuming he is similarly situated to inmates who committed their offenses after the effective date of amended section 4019, the Legislature nonetheless had a rational basis for treating the latter inmates differently. Amended section 4019 was part of larger legislation whose purpose was to "to reduce recidivism and improve public safety, while at the same time reducing corrections and related criminal justice spending.' " (*Rajanayagam*, *supra*, 211 Cal.App.4th at p. 55.) "[I]n choosing October 1, 2011, as the effective date of [amended section 4019], the Legislature took a measured approach and balanced the goal of cost savings against public safety. The effective date was a legislative determination that its stated goal of reducing corrections costs was best served by granting enhanced conduct credits to those defendants who committed their offenses on or after October 1, 2011. To be sure, awarding enhanced conduct credits to everyone in local confinement would have certainly resulted in greater cost savings than awarding enhanced conduct credits to only those defendants who commit an offense on or after the amendment's effective date. But that is not the approach the Legislature chose in balancing public safety against cost savings. [Citation.] Under the very deferential rational relationship test, we will not second-guess the Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced

20

conduct credit to only those defendants who committed their offenses on or after October 1, 2011." (*Rajanayagam*, at pp. 55-56.)

## DISPOSITION

The convictions for counts 2 and 3 are reversed. The trial court is directed to modify the abstract of judgment accordingly and to send a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

AARON, J.

IRION, J.

21