Filed 9/1/20  P. v. Dilgerparks CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B299563 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA072102) |
| v. | |
| JOSHUA DILGERPARKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Charles A. Chung, Judge.  Affirmed.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

# I.    INTRODUCTION

A jury found defendant Joshua Dilgerparks guilty of, among other crimes, attempted premeditated murder, and the trial court sentenced him to prison for 39 years to life.  On appeal, defendant contends that the trial court violated his rights under Evidence Code section 352 (section 352) and due process by admitting evidence of his membership in a white supremacist gang.  According to defendant, the evidence was more prejudicial than probative and so inflammatory that it denied him a fair trial.  We affirm.

# II.    FACTUAL BACKGROUND

## A.    *Prosecution's Case*

### 1.    The Victim

On July 12, 2017, Arley Carter (the victim) went to pick up tools at a house he owned on West Avenue in Lancaster.  No one was supposed to be living at the house, which the family was remodeling.[1]  As he drove by the house, the victim saw two cars parked in front, so he stopped and noticed that the locked gate to the construction fencing around the property had been breached.  He parked in front of the house and, as he walked toward the house, he heard his daughter Carley Carter say, "'Shit.  My dad's

---

[1]    The victim's wife, Loretta Carter, told the victim that she had seen someone at the house the day before.

here.'"[2]  Through the open front door, the victim saw seven or eight people inside the house and noticed that the newly installed french doors to the back of the house were in the process of being removed.

When the victim tried to enter the house, someone slammed the door in his face, so he picked up a baseball bat from the ground and hit the door with it.  After a few minutes, Carley opened the door, but she and a 350-pound man prevented the victim from moving past the entryway.  The victim "told them all to get the 'F' out of there" and threatened to call the police.

As people started to leave the house, defendant[3] emerged from the back room, pointed a semiautomatic handgun in the victim's face, and said, "'I will shoot you in your [expletive] head, you [expletive].'"  The victim looked at Carley and exclaimed, "'Now you [have] people like this in my house threatening me with guns.'"  The victim then turned around and walked out.

The victim went to his truck, moved it toward the neighbor's house, retrieved a pencil and paper, and attempted to write down the license plate numbers of the two cars at his

---

[2]  Because Loretta and Carley Carter share the same last name, we will refer to them by their first names.  Carley, who had "issues with drug abuse," had her own home and should not have been staying at the house.

[3]  The victim identified defendant at trial, but noted that defendant's head was shaved at the time of the incident.  The victim also noticed during the incident that defendant had tattoos all over his body, including "88" and a swastika.  When the victim spoke to the detectives, two days after the shooting, he was only able to identify the person who shot him by his tattoos.

house.  He also told his neighbor that someone had threatened him with a gun and asked her to call the Sheriff's Department.

While the other people in the house came out and prepared to leave, Carley approached the victim and asked him not to "get [her friend] Jan in trouble."  According to the victim, the "little black car left first," followed by a gold car.  As the black car approached the victim's location, it slowed down, and defendant leaned out of the back passenger window and "mumbl[ed] . . . M.M. mother fucker . . . ."[4]  Defendant then shot the victim in the leg.  A neighbor from across the street came to his aid and applied a tourniquet to his bleeding leg.  An ambulance arrived and took him to the hospital.

At the hospital, the victim was treated for a .22 caliber gunshot wound to his left thigh.  Doctors did not remove the bullet.  The parties stipulated that because there were several arteries and veins that ran through the mid-thigh, injuries to that area could be fatal.

2.     The Eyewitnesses

According to Carley, in 2017, she was struggling with methamphetamine addiction.  On July 12, 2017, Carley was at the house with several other people, including defendant.  When she saw the victim arrive at the front gate of the construction fencing, she locked the security screen door and tried to "get everybody . . . out of there."  The victim picked up a bat and

---

[4]     The victim learned after the incident that M.M. was the name of a white supremacist gang and he received several threats from gang members following the shooting.

4

knocked on the screen door.  Carley opened the door and "[s]ome people started [to leave]."

As the victim was standing just inside the front door, defendant emerged from a back room, went "straight to [the victim]", "[p]ut the gun [to] his [fore]head", and said, "'I'm gonna kill you.'"  Carley "jumped in between [the two men]" and stated, "'Don't shoot my dad, don't shoot my dad.'"  She pushed the two men apart.  The victim turned toward the door and announced that he was going to call the police.

As people began to leave the house, Carley chased after the victim and reached him as he was shutting the door to his truck.  Carley followed the victim as he moved his truck toward the neighbor's house.  As Carley spoke to the victim, a black car with three people inside pulled up to their location and slowed down.  Defendant, who was in the rear passenger seat, pointed a gun out the window toward the victim.  Carley heard a shot and saw the victim look down at his leg to where he had been shot.

Approximately six weeks after the shooting, Carley was arrested for an unrelated crime.  Carley knew that defendant was a member of a white supremacist gang, either the Antelope Valley Skinheads or the Aryan Brotherhood, and was afraid of what might happen to her "if [she] were to snitch on a member of [that gang]."  She felt vulnerable in custody so she "reach[ed] out to the detectives handling this case . . . ."[5]  The statement that she then gave to the police was not completely truthful because she was afraid of defendant and his gang.  Among other things,

---

[5]     During her interview with detectives, Carley offered to provide information about the shooting in exchange for a "deal," but they declined her offer.

she told detectives that defendant was protecting her from an attack by the victim.

After Carley was released from jail, unnamed "people" told her to take her son, leave town, and that "everything would be okay" if she did not testify. Between the shooting and trial, Carley had been told not to testify and threatened at least eight times. She was afraid to testify at trial because of "[p]eople on the streets."

Two of the victim's neighbors who witnessed the shooting also testified.

### 3. Arrest and Investigation

On August 30, 2017, Los Angeles County Sheriff's Department Detective David Duran was working in the gang surveillance unit assigned to assist Detective Brian Judge in the apprehension of defendant. At around noon that day, he and several other law enforcement personnel went to a location on 18th Street in Lancaster that was associated with defendant. At around 3:30 p.m., detectives ordered everyone to come out and defendant responded by walking out of the house. The detective then ordered defendant to walk toward the deputies with his hands behind his back. Detective Landreth then took over giving the same commands, but defendant "was just standing there. He was flipping [the deputies] off." Defendant "also gave the Nazi salute to [the deputies]."

Detective Landreth continued giving defendant commands "off and on;" another deputy with a PA system in his patrol car and a Sheriff's helicopter also gave commands. But defendant continued to ignore the commands for 20 to 25 minutes. During

that time, defendant "was going in the house, to the side of the house, [and] in between the vehicles that were parked in the driveway." Defendant eventually complied with the commands and was arrested.

Detective Judge was a member of the gang unit and assigned to investigate the shooting. When he interviewed the victim on July 14, 2017, the victim provided defendant's name and the detective used that information to assemble a six-pack photo array from which the victim was able to identify defendant's photo. The detective also showed Carley a six-pack photo array from which she identified defendant's photo.

Detective Judge interviewed defendant at the Lancaster station about the shooting after his arrest. Defendant told him that the day before the shooting he was at the West Avenue home working on the remodel. Defendant was napping and was awakened when Loretta yelled at him. When defendant got up and Loretta saw him in the hallway, she said, "'Oh, you are not a spick.'" Defendant explained that the next day "racial slurs" were also used and Detective Judge observed that defendant seemed offended by being called "a racial slur for Hispanics." When Detective Judge asked defendant if he shot the victim, defendant said that he could not talk about it "because he did[ not] want to be labeled a rat," i.e., "someone that would provide information that would possibly get someone else arrested or in trouble." Defendant admitted that he was a member of the Antelope Valley Skins. Detective Judge knew, based on his training and experience as a gang investigator, that Antelope Valley Skins associated and shared common beliefs with the Metal Minds gang, which was also known by the initials "M.M."

7

During the interview, defendant showed the detective an "88" tattoo on his torso and a swastika tattoo on his back.[6] Those tattoos matched the ones the victim had earlier described to the detective.

According to Detective Judge, the Antelope Valley Skins gang used intimidation to avoid consequences in criminal cases. It was common for that gang to tell witnesses not to come to court. Carley contacted Detective Judge on two or three occasions and told him that people were threatening her and her family.

The prosecution played audio clips of recordings of defendant's telephone calls while in jail. Among other clips, the jury heard the following excerpts of defendant's September 9, 2017, call, during which he stated that "[he] and [his girlfriend] Kasey [were] asleep . . . in one of the rooms one day and [Loretta] show[ed] up flipping out. [She c]alled [him] a spic and every other thing for a Mexican that she [could] think of other than just saying that [he] was Mexican. [¶] . . . [¶] So [he came] out of the room and she look[ed] and [said] 'oh, you're not a spic.' [He] said 'no.' And she [said] 'I apologize, it was kinda dark in there and you looked Mexican in there sleeping, and that's all my daughter hangs out with.' [Defendant] said 'no, [he had run] all of them out of [there]. There [were] no more of them around [there].' Well before she realize[d] that [he] was white she [had] a big old buck knife in her hand that she[ was] swinging . . . . And [defendant] was like 'ok.' So she relaxes, she [was] cool, fine. [¶] . . . [¶] [ ] Well [the victim] show[ed] up and [he had] molested

---

[6]     White supremacist gangs commonly had "88" and swastika tattoos. 88 stood for H.H., or Heil Hitler, and the swastika was the most common white supremacist symbol.

[Carley] when she was younger.  [¶]  . . .  [¶]  So she [did not] get along with [the victim].  Well he start[ed] swinging the bat and the knife and everything and [defendant] told him 'look dude you need to chill out, relax.'  And he call[ed defendant] everything, every name but white, and every name you [could] think of to be disrespectful towards a Mexican.  [Defendant] said 'what is with you guys!?'  [¶]  . . .  [¶]  [ ] 'Do you not realize I am not Mexican?  Do I look Mexican?  I've got a shaved head.  I've got 'Love the White Life' tattooed on the back of my head.  What is with you guys?'  [¶]  . . .  [¶]  And [the victim was] flipping out . . . .'  [Defendant said,] 'look call your wife.  Call and talk to your wife.'  [The victim said,] '[o]h you're that stupid spic [expletive] . . . .'  [Defendant said] 'excuse me, again, where do you get Mexican when you look at me?'"

B.     *Defense Case*

Defendant testified on direct examination as follows:  During the ten-day period prior to July 12, 2017, defendant was at the house on West Avenue helping Carley with the remodel.  The day before the incident, when Loretta came to the house and said, "'Oh, you are not that Spick,'" defendant was amused.

On the day of the incident, defendant was in the back bedroom with Carley, looking over some drywall they had just installed.  He heard his girlfriend Kasey scream from the front room.  Defendant went to the front room and saw the victim with a baseball bat and knife.  The victim told everyone to get out of the house.  Defendant told the victim to calm down and asked what was wrong.  The victim waved the bat at everyone in the room, and then advanced as if "he was going to swing."

9

Defendant "pulled a .22 automatic out of [his] back pocket and pointed it away from [the victim] and repeated for him to calm down."

When the victim walked out of the residence and went toward his truck, defendant believed that he had left the scene. Defendant told his girlfriend and two other friends that they should leave and come back later. At that point, defendant saw the victim coming back up the driveway with a bat in his hand. When the screen door slammed in his face, the victim banged on the door with the bat, came inside, and advanced toward people with the bat raised. Defendant pulled the automatic from his pocket again and pointed it in the victim's face. The victim said, "'Oh, you are that [expletive] Spick.'" Carley pushed the gun to the side, pushed the victim out the door, and ran past him outside.

Defendant and his girlfriend entered his friend's car to leave the scene. But he saw the victim in front of the neighbor's house grab Carley by the throat with the bat raised. Defendant yelled out the back window of the car, "'Hey, let her go.'" The victim then swung the bat at Carley, hitting her on the shoulder as she ducked. Defendant leaned out the window of the car and shot the victim in the leg. According to defendant, he did not intend to kill the victim and purposely aimed at the victim's leg. He believed that if he did not shoot the victim, he would have continued to hit Carley with the bat and seriously injure her.[7] Defendant left the scene and evaded arrest because of his criminal record and because he was scared.

---

[7]     Prior to the incident, Carley had told defendant that the victim had physically abused her for her entire life.

Defendant denied telling anyone to keep the victim from coming to court. When he said in a phone call from jail that the victim should go on vacation, he meant that it would be better for him not to come to court than to come to court and lie about the shooting.

On cross-examination, defendant admitted he had a swastika tattoo on his chest; an "88" tattoo on his stomach; a "'skinhead'" tattoo on his arm; a "'Love the White Life'" tattoo across the back of his head; and "'A.V.S.'" tattoos on multiple parts of his body, including on his eyebrow. Defendant also admitted he was a member of the Antelope Valley Skins, that his street name was Havoc, and that his gang did not like snitches. Defendant further admitted he was proud to be white and that his gang was exclusively white.

## III.   PROCEDURAL BACKGROUND

In an amended information, the Los Angeles County District Attorney charged defendant in counts 1 and 2 with assault with a firearm in violation of Penal Code section 245, subdivision (a)(2);[8] in count 3 with possession of a firearm by a felon in violation of section 29800, subdivision (a)(1); in count 4 with resisting a police officer in violation of section 148, subdivision (a)(1); and in count 5 with attempted murder in violation of sections 664 and 187, subdivision (a), and it was also alleged that the murder was willful, deliberate, and premeditated. The information further alleged:  as to counts 2 and 5 that defendant personally used a firearm, personally

---

[8]     All further statutory references are to the Penal Code, unless otherwise indicated.

11

discharged a firearm, and personally discharged a firearm causing great bodily injury within the meaning of sections 12022.53, subdivisions (b), (c), and (d); as to counts 1, 2, 3, and 5 that defendant suffered three prior convictions for which a prison term was served within the meaning of section 667.5, subdivision (b); and as to counts 1, 2, 3, and 5 that defendant had been convicted of a prior serious and/or violent felony within the meaning of sections 667, subdivision (b) through (j) and 1170.12.

The jury found defendant guilty on all counts and found true the allegations that defendant personally used a firearm and personally discharged a firearm causing great bodily injury. The jury also found that the attempted murder was committed willfully, deliberately, and premeditatedly. Defendant admitted that he had suffered three prior convictions for which prior prison terms were served and that he had suffered one prior strike conviction.

## IV.  DISCUSSION

### A.  *Background*

Prior to trial, the prosecution filed a motion to admit evidence of defendant's skinhead tattoos and related evidence. According to the prosecution:  (1) the evidence of defendant's racial views was relevant to his motive for shooting the victim; (2) the evidence of his gang tattoos was relevant to identification; (3) the evidence of his gang affiliation was relevant to explain why Carley recanted her in-custody statement to detectives claiming that defendant acted to defend her; and (4) the evidence

12

of defendant's Nazi salute to police during his arrest was relevant to the prosecution's theory of the case.

At the pretrial hearing on the motion, the trial court indicated that defendant's gang "membership in the A.V. Skins, the tattoos, [and] the Seig Heil Hitler sign during [defendant's] interaction [with the police were] all relevant." In response, defense counsel maintained that the tattoo evidence was not relevant to identification because the eye witnesses could testify that the suspect had tattoos on "his neck or . . . stomach," without specifying the type of tattoos; and the detective could confirm that defendant had tattoos on those parts of his body, without further identifying the tattoos. Counsel also argued that there was no evidence that Carley feared defendant or his gang at the time she gave her exculpatory statement to the detective, and defendant's gang affiliation therefore was not relevant to her credibility. Finally, counsel argued that the gang affiliation and tattoo evidence was "more prejudicial than probative." The trial court provided its tentative ruling to admit the evidence and stated that it would later make a "fuller record of this issue."

Later in the trial, the court formalized its ruling on the motion. It stated that the evidence was relevant to motive, that is, to demonstrate that defendant was angry that he had been mistaken for a Hispanic and called a racial slur. The court further concluded that defendant's association with a white supremacist gang was relevant to Carley's credibility in that she had been directed not to appear at court but decided to do so, which the court concluded "add[ed] to her credibility." The court also concluded that defendant's gang membership was relevant to explain Carley's prior inconsistent statement in defendant's favor.

13

B.      *Legal Principles and Standard of Review*

        "Under the Evidence Code, all relevant evidence is admissible unless prohibited by statute.  (Evid. Code, § 351.) "'Relevant evidence is defined in Evidence Code section 210 as evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.'" (*People v. Bivert* (2011) 52 Cal.4th 96, 116–117 . . . .)  But under . . . section 352, the trial court retains the discretion to exclude relevant evidence if 'its probative value is substantially outweighed by the probability that its admission will' either 'necessitate undue consumption of time' or 'create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'  'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice."  [Citation.]'" (*People v. Young* (2019) 7 Cal.5th 905, 930–931.)

        "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 70 . . . ; *Spencer v. Texas* (1967) 385 U.S. 554, 563–564 . . . ; *People v. Falsetta* (1999) 21 Cal.4th 903, 913 . . . ['The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally

14

unfair']; see also *Duncan v. Henry*[ (1995)] 513 U.S. [364,] 366.)"
(*People v. Partida* (2005) 37 Cal.4th 428, 439.)

C.    *Analysis*

    1.    <u>Section 352</u>

Defendant contends that the trial court's ruling allowing
the admission of the gang-related evidence violated state law
under section 352 because it was minimally relevant and unduly
prejudicial. According to defendant, the tattoo evidence was not
needed to establish defendant's identity because each of the
witnesses identified defendant at trial without reference to the
gang tattoos; and the gang affiliation evidence was not relevant
to the issue of guilt on the murder count because motive was not
an element of attempted murder, and the prosecution used it
instead, not to show intent to kill or premeditation, but to argue
that defendant, as a neo-Nazi skinhead, had a propensity to
commit murder. Defendant further maintains that any minimal
relevance the evidence might have had was far outweighed by the
inherently prejudicial nature of defendant's white supremacist
gang beliefs.

As an initial matter, although motive is not an element of
murder or premeditation, it was a factor that the jury could
consider in determining defendant's guilt on the murder charge.
Without objection, the trial court instructed the jurors using
CALCRIM No. 370, which expressly informed them that they
could consider defendant's motive and that "[h]aving a motive
may be a factor tending to show that the defendant is guilty."

15

And, contrary to defendant's assertion, the gang-related evidence served as the basis for the prosecution's theory of the case—that defendant shot the victim because both the victim and his wife called him a Mexican, a racial misidentification that insulted his white supremacist identity. During his interview with Detective Judge and in recorded jailhouse calls, defendant detailed and repeated the two incidents during which the victim and his wife referred to him as a Mexican, despite his appearance and prominently displayed white supremacist tattoos. Thus, defendant's own comments about those incidents supported an inference that he was angry about being referred to as a Mexican, and Detective Judge confirmed that defendant appeared to be offended by what he considered racially motivated slurs. Moreover, defendant's white supremacist gang tattoos, his admitted membership in such a gang, and his Nazi salute during his arrest[9] all suggested that he was openly proud of and defiant about his gang affiliation, and tended to explain why he would be upset by being repeatedly called a Mexican. Finally, defendant's reference to "M.M."—a white supremacist gang—just before shooting the victim supported a reasonable inference that the shooting was related to and in retaliation for the prior insults to his white supremacist identity.

In addition, defendant's gang membership was relevant to Carley's credibility. She testified that she was aware of defendant's gang membership; that she was afraid of "snitching on him" because of that membership; that she was so afraid of

---

[9]     Indeed, evidence of defendant's conduct following officer commands, including his Nazi salute, was also relevant to count four, which charged him with resisting, delaying, or obstructing a peace officer.

him during her incarceration that she gave the detective a false statement that exculpated defendant; and that she had been repeatedly threatened and told not to testify during the two-year period between the shooting and the trial.  That evidence explained her prior inconsistent statement to the detective in custody and served to refute defendant's attempts to impeach the credibility of her trial testimony concerning the details of the shooting.

Given the direct relevance of the gang evidence to issues in dispute, the trial court did not abuse its discretion by finding that its probative value was not substantially outweighed by undue prejudice.  As noted, the court had broad discretion in making that determination; and the fact that the evidence was damaging to defendant did not make it unduly prejudicial.  (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [the term prejudicial in section 352 is not synonymous with damaging]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1214 [all evidence that proves guilt is damaging].)

Moreover, prior to opening statements, the jury was admonished generally not to allow bias or prejudice influence their factual determinations and it was specifically instructed to consider the gang evidence only on the issues of motive and credibility, and not as propensity evidence.  Because we presume that the jury understood and followed those instructions (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 861–862), we conclude that the gang evidence and the prosecutor's comments about it during opening statement could not have had the inherently prejudicial effect attributed to it by defendant.

17

## 2. Due Process

Defendant also contends that the trial court's ruling allowing the admission of the gang-evidence violated his right to a fair trial under the federal and state due process clauses. According to defendant, the admission of the challenged evidence, and the prosecutor's comments and arguments about it, were so inflammatory that they permitted the jury to find guilt based on "extraneous factors," such as bias, which, in turn, effectively lessened the prosecution's burden to prove each element of murder beyond a reasonable doubt. In particular, defendant maintains that the prosecutor's comments on the evidence during opening statement invited the jury, when considering intent to kill, to infer from defendant's white supremacist beliefs that he had a propensity to commit murder.

In support of his due process argument, defendant relies primarily on *Dawson v. Delaware* (1992) 503 U.S. 159 and *People v. Young, supra*, 7 Cal.5th 905. He argues that here, as in each of those cases, there was no evidence that the shooting was motivated by racism, and therefore the admission of the gang-related evidence violated due process and requires reversal of defendant's conviction.

To the extent defendant's due process argument is based solely on the trial court's admission of the gang evidence over his section 352 objection, our conclusion that the admission was proper under that section disposes of defendant's constitutional claim. (*People v. Winbush* (2017) 2 Cal.5th 402, 458; *People v. Thomas* (2012) 54 Cal.4th 908, 935; *People v. Riggs* (2008) 44 Cal.4th 248, 304.) And, to the extent defendant's due process claim is premised upon an independent constitutional objection to

the evidence that was unrelated to the state law objection under section 352, defendant forfeited that separate constitutional claim by failing to raise it in the trial court.  (*People v. Partida, supra*, 37 Cal.4th at p. 436.)

## V.    DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KIM, J.

We concur:

RUBIN, P. J.

BAKER, J.