Filed 3/5/26  P. v. Doster CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAMES ANDREW DOSTER,<br><br>Defendant and Appellant. | F088710<br><br>(Super. Ct. No. RF009297A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David R. Zulfa, Judge.

James Bisnow, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant James Andrew Doster was found guilty by a jury of robbery, burglary, shooting at an inhabited dwelling, assault with a firearm, battery with serious bodily injury, vandalism, and three related firearms charges. Defendant was found not guilty of discharging a weapon with gross negligence. The jury found true multiple enhancements, including that defendant personally and intentionally discharged a firearm, and the court found true multiple aggravating circumstances.

Defendant now appeals, asserting a retrial is required because: (1) the trial court erred in discharging one of only two Black prospective jurors, over defense counsel's objection, where the prosecutor cited the juror's multiple family members with criminal records as a basis for the use of peremptory challenge, in violation of Code of Civil Procedure section 231.7;[1] (2) the trial court violated the Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (the Racial Justice Act or the Act) by allowing a witness to refer to defendant as "colored," and trial counsel was ineffective for failing to object to the witness's statements; and (3) the evidence is insufficient to support a true finding that defendant intentionally discharged a firearm. The People dispute all defendant's contentions, arguing among other things that no section 231.7 violation occurred because all questions posed to the potential juror concerned his ability to understand the proceedings, the juror was evasive in answering questions about his family, and there was no "racial component" to this voir dire.

We conclude section 231.7 was violated; we thus reverse and remand the matter for a new trial.

**PROCEDURAL HISTORY**

On January 31, 2024, the Kern County District Attorney filed an information charging defendant with first degree residential robbery (Pen. Code, § 212.5, subd. (a); count 1); first degree residential burglary (*id*., § 460, subd. (a); count 2); shooting at an

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

inhabited dwelling (*id.*, § 246; count 3); discharge of a firearm with gross negligence (*id.*, § 246.3, subd. (a); count 4); assault with a firearm (*id.*, § 245, subd. (a)(2); count 5); battery with serious bodily injury (*id.*, § 243, subd. (d); count 6); possession of a firearm by a felon (*id.*, § 29800, subd. (a)(1); count 7); possession of ammunition by a felon (*id.*, § 30305, subd. (a)(1); count 8); armed criminal action (*id.*, § 25800, subd. (a); count 9); and vandalism over $400 (*id.*, § 594, subd. (b)(1); count 10). Count 10 was later amended to be charged as a misdemeanor. Additionally, the information included the following special allegations: personal use of a firearm and personal and intentional discharge of a firearm (*id.*, § 12022.53, subds. (b), (c); as to count 1); use of a firearm (*id.*, § 12022.5, subd. (a); as to counts 2 and 6); and infliction of great bodily injury (*id.*, § 12022.7, subd. (a); as to counts 1, 2 and 5). In connection with all counts, the first amended information alleged circumstances in aggravation under the California Rules of Court. Defendant waived his right to a jury trial on the circumstances in aggravation.

On August 1, 2024, the jury found defendant guilty of all counts save count 4 and found true each of the enhancement allegations as to counts 1, 2, 5, and 6. After a bifurcated hearing outside of the presence of the jury, the court found true all circumstances in aggravation.

On August 29, 2024, the trial court sentenced defendant to four years (the middle term) on count 1, plus 20 years for the Penal Code section 12022.53, subdivision (c) enhancement, plus three years for the great bodily injury enhancement, for a total of 27 years. The trial court further imposed a concurrent 180-day term on count 10; the sentences on the remaining counts, including a 10-year term on the Penal Code section 12022.53, subdivision (b) enhancement, were stayed under Penal Code section 654.

Defendant filed a notice of appeal on September 16, 2024.

3.

# FACTUAL SUMMARY

On September 15, 2023, at approximately 1:20 a.m. in Ridgecrest, California, defendant knocked "very hard" on the main door of a mobile home inhabited by 64-year-old M.M. Defendant yelled, "[O]pen," but M.M. refused as she did not know defendant. Defendant then knocked on the back door "really hard," broke the glass, and entered the home. M.M. called her daughter on the phone, crying and screaming, "No. Please no. Please no," and "Police." On the call, the daughter heard defendant cursing at M.M. and telling her to be quiet; M.M.'s daughter hung up the phone and called 911. M.M. called her daughter back and let it go to voicemail, recording the remainder of the encounter.

Defendant kicked in M.M.'s locked bedroom door and entered the room. Defendant pointed a handgun at M.M. and told her he was looking for someone, saying a woman's name, but M.M. did not know this person. When M.M. told defendant she did not speak English, defendant continued screaming at her. M.M. attempted to escape out of the back door of the home, but defendant grabbed her by the arm "really hard," grabbed her hair, pulled her, and hit her "hard" on the head with the gun. The gun discharged, striking the exterior wall of the mobile home and traveling into M.M.'s bedroom. Defendant then pushed M.M. back into the bedroom, took her phone, and locked her inside. M.M. saw defendant's face and noted he wore a red sweatshirt. After 15 to 20 minutes, defendant left the residence.

M.M.'s daughter arrived at the mobile home park at the same time as law enforcement. She saw a "guy with a red hoodie" running away and notified law enforcement of this. Approximately 10 minutes later, officers apprehended defendant on a nearby streetcorner; he was unarmed, sweating, and was not wearing a red sweatshirt. Law enforcement located the handgun nearby; it had one bullet expended and was rolled up in a red sweatshirt. Security footage from that time showed a person wearing a sweatshirt go to the area where officers found the red sweatshirt, then leave having removed it. The results of DNA testing constituted "strong support for a match" of

4.

defendant's DNA on the gun and sweatshirt. There were also multiple similarities between the shoeprints found outside M.M.'s home and the design, tread, and wear pattern of defendant's shoes. Law enforcement found M.M.'s phone in a dumpster in the mobile home park.

Paramedics arrived and tended to M.M., who had a bruise on her head and bloodied bare feet. As M.M. and her daughter were sitting in the ambulance outside of the house, law enforcement presented defendant, and M.M. identified him as the assailant. M.M. was treated for her injuries at the hospital, and she suffered from headaches that lasted a month.

## DISCUSSION

### I. Peremptory Challenge Against an African-American Juror with Relatives Who Had Interactions with the Criminal Justice System

Defendant first asserts the trial court violated section 231.7 when it permitted the prosecutor to exercise a peremptory challenge against a prospective juror who had identified as African-American because the prospective juror's relatives had committed crimes. The People contend there was no racial component to the use of the peremptory, noting the prosecutor's concern about the prospective juror's evasiveness and inability to read, understand, and process information. We find the prosecutor's stated reasons for exercising a peremptory against the African-American prospective juror violate the prohibitions of section 231.7. We therefore reverse and remand for a new trial.

#### A. Additional Background

During voir dire, the trial court questioned prospective juror M.W. alongside the other prospective jurors. M.W. stated he was 72 years old, was married with 10 children, and identified as an African-American. He was retired from a warehouse job, had completed the 11th grade, and had lived in Bakersfield his entire life. Out of the presence of the other jurors, the trial court disclosed it had assisted M.W. in filling out the juror questionnaire, as M.W. indicated he was unable to read. On this form, M.W. indicated he

suffered from headaches and lack of "focus" and burning eyes, and that he used aspirin and eyedrops for those problems. The court asked M.W. if he could raise his hand if he needed an accommodation or started losing focus during a trial, and M.W. said he could. M.W. could not say if his impairment would hinder his ability to serve as a juror, but he confirmed he was able to focus on the court's questions during voir dire.

Later, also outside the presence of the other prospective jurors, the court questioned M.W. about his experience with the criminal justice system that included the following exchange:

> "[THE COURT:] Do you have an overall opinion of the criminal justice system? Your options are: Very positive, somewhat positive, neutral, very negative or somewhat negative.
>
> "[M.W.:] I'm positive about it.
>
> "Q. You're positive about it?
>
> "A. Mm-hmm.
>
> "Q. Do you have any specific comments other than just you have a positive view of the justice system?
>
> "A. No.
>
> "Q. Have you or someone close to you – [¶] When I'm talking about somebody close to you, I'm talking about somebody you interact with on either throughout your life on a regular basis or currently on a regular basis. I'm not talking about somebody that maybe 40 years ago you knew and haven't had contact with since high school or something like that. You know what I mean? [¶] Have you or someone close to you been the victim of a crime or affected by crime?
>
> "A. My niece got murdered last year.
>
> "Q. Was that here in Kern County?
>
> "A. Yes.
>
> "Q. Do you know if anybody has been arrested?

6.

"A. Well, he was arrested but they cut him loose.

"Q. So somebody was arrested but they were released?

"A. They were released.

"Q. There was no trial?

"A. Well, they took him to trial. They let him out on bail then they took him back to trial and they let him go.

"Q. You said that was here in Kern County?

"A. Yes, here in Bakersfield.

"Q. Did you go to the trial at all?

"A. Nope.

"Q. Is there anything related to your niece's situation that would impact your ability to set that aside and judge [defendant's] case on its own merit and on its own facts?

"A. Yes.

"Q. You could do that?

"A. Mm-hmm.

"Q. Have you or someone close to you been the witness to a crime?

"A. Not that I know of.

"Q. Have you or someone close to you been accused of a crime?

"A. Not lately.

"Q. Are you or anyone close to you employed currently or retired from law enforcement? That would include corrections or probation.

"A. My grandson, he was a guard at the prison. My stepson, he was a guard at the prison.

"Q. Have you or anyone close to you had a significant experience either good or bad with law enforcement?

"A. No.

"Q. Do you have any opinions generally about law enforcement? Do you think they do good, bad, some are good, some are bad?

"A. I only had one experience with them and I looked at it as I was in the wrong place at the wrong time.

"Q. So no real strong opinions about law enforcement?

"A. No." (Boldface omitted.)

The court's remaining questions to M.W. concerned his prior jury service, whether he had any knowledge of defendant's case or the anticipated witnesses, or any other issues or biases that would impair his impartiality; each time, M.W. responded with brief answers. Later, the court again questioned M.W. about his experience with his niece's murder, asking whether that would impact his judgment in defendant's case. M.W. confirmed it would not, and confirmed he could decide defendant's case based on the evidence and the law. The court observed, "You look like a man with common sense," and M.W. responded, "I hope so."

The next day, M.W. agreed with defense counsel's statements (as did other jurors) that law enforcement could harbor biases, and the jurors would need to weigh all witnesses' testimony. During the prosecutor's questioning, M.W. agreed that a mastermind, aider and abettor, thief, and getaway driver could all suffer convictions for robbing a store, assuming the evidence supported these charges. The prosecutor eventually returned to questioning M.W. about his relationship to others who had been convicted of crimes:

"[PROSECUTOR]: And then, [M.W.], we spoke yesterday a little bit apart from the other jurors. I wanted to ask you about the questionnaire questions and correct me if I got this wrong but there was a point where it asked if anyone close to you has been accused of a crime and I had written down your response as 'Not lately.'

"[M.W.]: Not lately.

"[PROSECUTOR]:  Can you help me understand what that means.

"[M.W.]:  Well, when you're born in a big family, 13 of us, a lot commit crimes.

"[PROSECUTOR]:  You say 13 of us?

"[M.W.]:  Yes.· I'm the seventh son.  I got six sisters and six brothers.

"[PROSECUTOR]:  And then you talked about having I think a total of ten.

"[M.W.]:  Yes.  Well –

"[PROSECUTOR]:  Children of your own.

"[M.W.]:  My five and her five.  They're all grown.

"[PROSECUTOR]:  The types of crimes that people close to you have been accused of, what types of crimes are we talking about?

"[M.W.]:  Well, like I said, my niece was murdered.  I got a nephew up in Sacramento who just got shot in a bar last week and he died and I got another nephew who got shot and he died.  And I had a bunch of nephews and brothers who went to jail for crimes.  Like I said it's a lot.

"[PROSECUTOR]:  Sounds like a lot.

"[M.W.]:  Yes.

"[PROSECUTOR]:  You mentioned the one – the nephew in Sacramento.  Did you have a nephew in the Bakersfield area?

"[M.W.]:  Yes, I did.

"[PROSECUTOR]:  And he was shot and died here as well?

"[M.W.]:  Yes.

"[PROSECUTOR]:  Does the name [E.W.] sound familiar?

"[M.W.]:  That's my nephew.

"[PROSECUTOR]:  How about [C.W.]?

"[M.W.]: That's my nephew. Anyone that carries [my last] name is my nephew.

"[PROSECUTOR]: That helps. With all of that that's happened to your family and people that you know, do you have – you must have some thoughts about the criminal justice system in general.

"[M.W.]: Well, I have different kind of opinion but I wasn't there at the time they did them and they did what they did and I can't judge them on what happened between them and what's happening in my life. I keep my opinion to me and I let them do what they do in their life.

"[PROSECUTOR]: Do you have any reason to think anyone in your family has been treated unfairly by the criminal justice system?

"[M.W.]: Well, growing up I did but when you got six brothers and a lot of them did – a few of them did a lot of crime and been to prison sometimes you think about it but they were there and I wasn't, so I couldn't – that's the opinion of the police or the justice system because I wasn't there to judge what was going on.

"[PROSECUTOR]: I think that's a fair conclusion. One of the things about being a juror is that you weren't there. You weren't there for the crime that happened in this case, if one happened at all. And so as a juror, you're going to be asked to make a conclusion despite the fact that you don't have personal knowledge, you don't know what [defendant] did or didn't. Are you going to be able to come to a conclusion or are you going to say similar to how you might have handled some issues in your family and say well how am I supposed to know, I wasn't there?

"[M.W.]: I wasn't there so I got to give him my own opinion after I hear the – I mean the trial go through and you give your opinion, he gives his opinion what happens on his and you give your opinion, I got to go on the judgment of what I think on how I handle is he guilty or not guilty.

"[PROSECUTOR]: And this is my – I call this – [¶] Thank you, [M.W.] I appreciate that."

Both the defense and prosecution agreed that there was no reason to strike any of the potential jurors for cause. When the court turned to the parties' peremptory challenges, the prosecutor executed two in total, the second of which was M.W.

Defendant objected, stating, "Your Honor, I'll note my objection," and the court stated it would take up the objection later.

Outside the presence of the jury, defense counsel stated it was making "a *Batson-Wheeler* type of objection."[2] (Italics added.) Counsel noted the importance of the racial composition of the jury as related to defendant's race, African-American. He stated M.W. "was one I think only of two African [-] American jurors . . . in the entire room." Defense counsel argued M.W.'s reading impairment was not a valid reason to excuse him, noting M.W. "was able to fully interact and answered all questions well." Counsel also noted M.W. answered the prosecutor's questions about his large family, arguing M.W. reaffirmed that these relationships would not put him in a position to fairly judge the case.

The prosecutor then argued his "initial concern" in having M.W. on the jury was that he appeared unable to read (either through a medical condition or elsewise), and this could make it difficult for the prosecutor to rely on printed references for the DNA evidence and printed jury instructions in closing. The prosecutor then stated:

> "I will note that [M.W.] quite frankly seemed like a nice guy. But the reason I asked him about his relationships with others was because of the question that he asked – was asked of the Court when the Court was verbally doing the questionnaire with him and asked specifically about does anyone you know been accused of a crime and his answer was not lately and he said nothing more about the subject. That struck me because [his last name] in Bakersfield is very well known particularly for prosecutors. When I heard [his last name], it reminded me of several cases that we have pending including a shooting case including [C.W.]. It reminded me of [E.W.] who was shot and killed when he attempted to assault an owner of a convenience store . . . several years ago. It reminded me of a conviction that we got less than a year ago against [T.W.] for a first-degree murder conviction. It reminded me of another murder conviction of a [C.W.]. And when I spoke with [M.W.], I was trying to get information to understand

_____

[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

11.

what, if any, connection he might have with [people who share his last name] that are common in Bakersfield that are on top of having multiple pending cases involving shootings, they're well known in the gang community, which as a prosecutor I did about ten years in the gang unit in Kern County where I personally prosecuted several members of [the W.] family for exactly these types of crimes. And when [M.W.] who was present basically said the first name that I brought up with him was [C.W.] and he said yep I know who that is. That's my cousin. And then [E.W.], yep I know who that is. Yes, that's the one that was shot and killed. He made it very clear that pretty much the entire [W.] community in Bakersfield is related to him. And then I started asking him the next question which for me was, well, if you have all of this involvement, your family has been shot at, has shot at others, has killed people, has been convicted of killing people, you know, how does that impact your view of the criminal justice system and his answer to me was well I wasn't there so I don't really know so that's they're [*sic*] own issue. And to me with the sheer number of issues that the [W.] family has been present in – gang related shootings, killings and murders – that answer was completely unacceptable to me. It was as unacceptable as his initial answer, which was 'Not lately.' When so many people that he knows ha[ve] either been shot at and killed or shot at and killed others, the fact that he went through that entire questionnaire which is asking over and over directly verbally from the Court being asked questions whether people have been accused of crimes or victims of crimes, the fact that none of that was brought up in the Court's initial questioning I found evasive and I found concerning. So for a combination of all of those reasons I was not comfortable having [M.W.] serve on this jury."

The court overruled defendant's objection, stating in full:

"At this time I will deny the *Batson-Wheeler* motion. I do not believe the challenge was exercised due to [M.W.]'s membership in a cognizable class. I think that there were independent reasons that were personal to [M.W.] as opposed to simply the fact that he is a member of that cognizable class and based on the totality of the circumstances, I do not believe that there was a violation of the *Batson-Wheeler* case law as well as California Code of Civil Procedure Section 231.7, et seq. I do think we have a clear clean record on that[.]" (Italics added.)

## B. Standard of Review

Our standard of review for section 231.7 claims is defined by statute as follows:

"The denial of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence. The appellate court shall not impute to the trial court any findings, including findings of a prospective juror's demeanor, that the trial court did not expressly state on the record. The reviewing court shall consider only reasons actually given under [section 231.7,] subdivision (c) and shall not speculate as to or consider reasons that were not given to explain either the party's use of the peremptory challenge or the party's failure to challenge similarly situated jurors who are not members of the same cognizable group as the challenged juror, regardless of whether the moving party made a comparative analysis argument in the trial court. Should the appellate court determine that the objection was erroneously denied, that error shall be deemed prejudicial, the judgment shall be reversed, and the case remanded for a new trial." (§ 231.7, subd. (j).)

## C.    Analysis

Peremptory challenges have been described as "a long-standing feature of civil and criminal adjudication." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1157.) Courts have long held that "the exercise of even a single peremptory challenge solely on the basis of race or ethnicity offends the guarantee of equal protection of the laws under the Fourteenth Amendment to the federal Constitution[, as well as] a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution." (*Ibid*., citing *Batson, supra,* 476 U.S. 79 and *Wheeler, supra,* 22 Cal.3d 258.)

However, courts have often recognized the shortcomings of *Batson*/*Wheeler*, especially in the realm of implicit and institutional biases. (See *People v. Bryant* (2019) 40 Cal.App.5th 525, 543–549 (conc. opn. of Humes, J.) [noting *Batson*/*Wheeler* framework is ineffective at eliminating purposeful discrimination and may even facilitate implicit bias in the jury selection process].) Recognizing this, the Legislature enacted Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Assembly Bill No. 3070), which created new procedures for identifying unlawful discrimination in the use of peremptory challenges. (See Legis. Counsel's Dig., Assem. Bill No. 3070, Stats. 2020, ch. 318,

13.

§ 1(b), Summary Dig., p. 2. [noting *Batson/Wheeler*'s "requiring proof of intentional bias renders the procedure ineffective" and finding "many of the reasons routinely advanced to justify the exclusion of jurors from protected groups are in fact associated with stereotypes about those groups or otherwise based on unlawful discrimination"].) Assembly Bill No. 3070 codified section 231.7, at issue here. (Stats. 2020, ch. 318; see § 231.7, subd. (d)(2)(C) [defining "unconscious bias" as including "implicit and institutional biases"].)

Section 231.7, subdivision (a) prohibits the use of "a peremptory challenge to remove a prospective juror on the basis of [their] race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those groups." If a party or the court believes this provision has been violated, the statute requires a motion for relief, and the court is to hear arguments outside of the presence of the potential jurors. (§ 231.7, subd. (b).) The party exercising the peremptory challenge is required to state the reasons for its use, and thereafter the court is to evaluate the arguments "in light of the totality of the circumstances," considering "only the reasons actually given" and refraining from speculating on, or assuming the existence of, other possible justifications. (§ 231.7, subds. (c), (d)(1).) The statute lists several nonexclusive factors the court may consider when evaluating the totality, including whether "[t]he objecting party is a member of the same perceived cognizable group as the challenged juror." (§ 231.7, subd. (d)(3)(A)(i).) The Legislature has prescribed that:

> "If the court determines there is a substantial likelihood that an objectively reasonable person would view race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, as a factor in the use of the peremptory challenge, then the objection shall be sustained. The court need not find purposeful discrimination to sustain the objection." (§ 231.7, subd. (d)(1).)

"[A]n objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California."  (§ 231.7, subd. (d)(2)(A).)  " '[S]ubstantial likelihood' means more than a mere possibility but less than a [preponderance]."  (§ 231.7, subd. (d)(2)(B).)  The court is to "explain the reasons for its ruling on the record."  (§ 231.7, subd. (d)(1).)

But the Legislature did not stop with this outline of the general procedure. Section 231.7 goes on to list circumstances where a peremptory challenge is presumed invalid absent some further showing by the proponent.  Relevant here, subdivision (e) states:

> "A peremptory challenge for any of the following reasons is presumed to be invalid unless the party exercising the peremptory challenge can show by clear and convincing evidence that an objectively reasonable person would view the rationale as unrelated to a prospective juror's race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or perceived membership in any of those groups, and that the reasons articulated bear on the prospective juror's ability to be fair and impartial in the case:  [¶] . . . [¶]

> "(3) Having a close relationship with people who have been stopped, arrested, or convicted of a crime."

" '[C]lear and convincing' refers to the degree of certainty the factfinder must have in determining whether the reasons given for the exercise of a peremptory challenge are unrelated to the prospective juror's cognizable group membership, bearing in mind conscious and unconscious bias."  (§ 231.7, subd. (f).)  The factfinder can make this determination if "it is highly probable that the reasons given for the exercise of a peremptory challenge are unrelated to conscious or unconscious bias and are instead specific to the juror and bear on that juror's ability to be fair and impartial in the case." (*Ibid.*)

As noted above, the court and prosecutor asked prospective juror M.W. multiple questions throughout voir dire, many common to the prospective jurors.  Throughout, M.W. reasserted his general ability to be fair and impartial, stated the court's proposed

15.

accommodations for his physical impairments could help him focus at trial, and appeared to comprehend the proceedings and the questions asked of him by the court, defense counsel, and the prosecutor. At the conclusion of voir dire, the court described M.W. as "a man with common sense." Neither side attempted to strike M.W. (or any other juror) for cause, but when the court turned to the parties' peremptory challenges, the prosecutor exercised two in total, the second of which was as to M.W. Defendant objected, and the court noted it would take up the objection later. This tracks the procedures outlined in section 231.7, subdivision (b), and we find the statute sufficiently raised before the trial court, given that the court overruled defendant's objection under both section 231.7 and *Batson/Wheeler*. (*People v. Jaime* (2023) 91 Cal.App.5th 941, 946 (*Jaime*) [finding no forfeiture despite defense counsel's failure to explicitly cite § 231.7 when objecting, given the substance of the arguments below and the trial court's analysis].)

Outside the presence of the jury, defense counsel argued for the importance of the racial composition of the jury, noting that defendant's race was African-American and that M.W. "was one of I think only two African [-] American jurors . . . in the entire room." The court then requested the prosecutor state the reasons for his use of the peremptory challenge on M.W. Though the prosecutor briefly mentioned a concern about M.W.'s ability to read, he quickly turned to the subject of M.W.'s family ties, describing in detail M.W.'s relationship with four relatives who had been either charged with or convicted of a crime. The Legislature has deemed such a use of a peremptory challenge "presumptively invalid." (§ 231.7, subd. (e)(3).) Thus, the question becomes whether the record demonstrates there were "clear and convincing" reasons to overcome this presumption. (§ 231.7, subd. (f).) We find there are not.

The record indicates there were concerns with M.W.'s being evasive in answering questions. However, aside from M.W.'s initial answer of "[n]ot lately" early in voir dire, the question and answer colloquy reveals M.W. did not hide his connections to his family and was forthright that many of them had committed crimes. Thus, we cannot say the

16.

stated rationale is "clear and convincing," as is required to rebut the presumption of invalidity. (§ 231.7, subd. (f); cf. *People v. Garcia* (2025) 115 Cal.App.5th 92, 109 (*Garcia*) [rejecting § 231.7 argument on appeal where the record supported the prosecutor's stated reasons for exercising a peremptory challenge against a Black prospective juror]; see *Rice v. Collins* (2006) 546 U.S. 333, 343 (conc. opn. of Breyer, J.) [finding the lack of a clear explanation of why peremptory challenges were exercised "may well reflect the more general fact that the exercise of a peremptory challenge can rest upon instinct not reason"].) Further, M.W. appears to have been rehabilitated when he stated his relatives' behavior and choices were their own and would not affect his ability to decide defendant's case on the facts and law. (Cf. *People v. Jimenez* (2024) 99 Cal.App.5th 534, 544 [finding clear and convincing reasons for use of peremptory challenge where a prospective juror repeatedly acknowledged she would have trouble setting aside her bias against law enforcement].) As another court has noted in interpreting section 231.7, "[t]o allow a party to bury presumptively invalid reasons under an overarching facially neutral reason . . . without the required findings under section 231.7, subdivision (f), would render section 231.7, subdivision (e) ineffective." (*People v. Uriostegui* (2024) 101 Cal.App.5th 271, 280 (*Uriostegui*).)

Our inquiry is further complicated by the trial court's ruling on defendant's motion. Section 231.7, subdivision (j), provides us with de novo review authority, but explicitly limits our review of a trial court's "express factual findings" for substantial evidence. However, in ruling on defendant's objection, the trial court only stated its conclusion and a general belief that "we have a clear clean record." Thus, there are no express factual findings to defer to, and in fact the trial court's early observation about M.W. was that he was a "man with common sense." Based on the record before us, M.W. does not appear to have been evasive or to otherwise have demonstrated an inability to be fair and impartial. (Cf. *Garcia*, *supra*, 115 Cal.App.5th at p. 109.)

We are aware that, under the previous framework of *Batson* and *Wheeler*, rationales such as a potential juror's halting, equivocal, or conflicting answers could justify a peremptory strike and support an affirmance. (See, e.g., *People v. Bivert* (2011) 52 Cal.4th 96, 111–112.) However, we are mindful of the Legislature's command that section 231.7 " 'be broadly construed to further the purpose of eliminating the use of group stereotypes and discrimination, whether based on conscious or unconscious bias, in the exercise of peremptory challenges.' " (*People v. Ortiz* (2023) 96 Cal.App.5th 768, 791–792.) The record indicates there was a presumptively invalid reason for excusing M.W. on a peremptory challenge and does not contain "clear and convincing evidence" to rebut that presumption. (§ 231.7, subd. (e); see *id*., subd. (e)(3); see also *id*., subd. (d)(2)(A) [reminding that "an objectively reasonable person is aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California"].) We find erroneous the trial court's overruling of defendant's objection to the use of a peremptory challenge against M.W.; the Legislature has left no recourse but to reverse the judgment and remand this case for a new trial. (§ 231.7, subd. (j); see *Uriostegui*, *supra*, 101 Cal.App.5th at p. 280; *Jaime*, *supra*, 91 Cal.App.5th at p. 946.)

## II.     Witness's "Colored" Testimony, under the Racial Justice Act

Defendant next contends the tenets of the Racial Justice Act were violated when the prosecution allowed one of its witnesses to testify that defendant was a "colored" person. Defendant argues that if we find forfeiture, we should find trial counsel ineffective for failing to object to this testimony.

Given that we are reversing the judgment and remanding for a new trial, this claim is arguably moot. However, as it is possible the witness may again be required to testify, we offer a brief analysis of defendant's argument.

## A.     Additional Background

At trial, the prosecution produced M.M.'s daughter as a witness.  When the prosecutor asked the daughter what she remembered about the "guy in the hoodie," the following exchange occurred:

> "[WITNESS]:  Bald guy, colored guy, red hoodie.  That's all I remember.
>
> "[PROSECUTOR]:  A lot of times when officers talk to witnesses, they ask them to describe the race of the person.
>
> "[WITNESS]:  Yes.
>
> "[PROSECUTOR]:  What was the race of the person that you saw?
>
> "[WITNESS]:  African[-]American."  (Boldface omitted.)

Later, when the prosecutor asked, "How did what happened to [M.M.] that night impact her in the days and weeks that followed?"  M.M.'s daughter stated:

> "Until this day she's still afraid of people.  She went back to work.  She's working.  But even at her job, when she's working and she hears a loud noise sometimes she's [*sic*] screams or she starts crying out of nowhere.  She gets nervous around colored people.  It's not over yet for her."

Defendant lodged an objection under Evidence Code section 352, which was overruled without further discussion.

## B.     Analysis

The People argue defendant forfeited his challenge under the Racial Justice Act.  Defendant did not object to the witness's first statement, but did offer an objection on Evidence Code 352 grounds after the witness's second statement.  To obviate a lengthy discussion on forfeiture, we exercise our discretion to reach the merits of defendant's argument.

Penal Code section 745 prohibits the state from "seek[ing] or obtain[ing] a criminal conviction . . . on the basis of race[.]"  (Pen. Code, § 745, subd. (a).)  We assume for purposes of our analysis that the witness's use of the term "colored" to describe

19.

defendant, an African-American man, implicates racial bias. (See *People v. Stubblefield* (2024) 107 Cal.App.5th 896, 918 [noting "[t]he contextual basis for an implicit appeal to racial bias may consist of facts or events so commonly known—e.g., the historical fact of slavery—that it may be reasonable to assume a listener is aware of them"].) However, defendant's claim fails because the Legislature explicitly limited the statute's application to "[t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror[.]" (Pen. Code, § 745, subd. (a)(1).)

Defendant contends that limiting the reach of the statute so that it does not apply to witnesses would allow the state to "insert bias into its presentation through its witnesses and escape responsibility for it." There could conceivably be a case where the prosecution deliberately leads a witness to "exhibit[] bias or animus towards the defendant because of the defendant's race[.]" (Pen. Code, § 745, subd. (a)(1).) However, a review of the record indicates the prosecutor did not solicit the witness's comment here—and in fact attempted to lead her away from the use of the pejorative immediately after the first time she used it—but the witness used the term twice of her own volition. Thus, this is not a case where the insertion of bias can be attributed to the state.[3]

## III.    Sufficiency of Evidence for Intentional Discharge of a Weapon

Lastly, defendant contends the evidence was insufficient to support a true finding on the Penal Code section 12022.53, subdivision (c) firearm enhancement. He argues the evidence only shows that when he struck M.M. with the gun, it accidentally discharged and so cannot support a finding that he intentionally fired the gun. We disagree.

---

[3] This is not to say this issue cannot be avoided, should this case return to trial and the witness be called to testify again. The parties now know the witness's preference for this term as a descriptor. The prosecution could easily remind the witness to avoid injecting her own racial bias into the proceedings or could also ask leading questions to solicit relevant facts—the goal being to afford defendant the dignity he deserves as he proceeds through our system of justice.

## A.      Standard of Review

In considering a challenge to the sufficiency of the evidence, we " ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57 (*Brooks*).)  We presume " ' "the existence of every fact the [jury] could reasonably deduce from the evidence." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 632 (*Lee*).)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  The defendant carries the burden of establishing that the evidence was insufficient to sustain a conviction.  (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1574.)

## B.      Analysis

The first amended information attached two firearm enhancements to count 1, including that defendant personally and intentionally discharged a firearm in the commission of a first degree residential robbery.  The jury found all enhancement allegations true.  But defendant argues there is no evidence of "reasonable, credible, and of solid value" to support the jury's finding of an intentional firing (*People v. Johnson* (1980) 26 Cal.3d 557, 578), and Penal Code section 12022.53, subdivision (c) does not punish the accidental discharge of a firearm (see *In re Ferrell* (2023) 14 Cal.5th 593, 603–604).

Defendant is correct the evidence could have supported a finding that the discharge of the gun was accidental.  However, we resolve conflicts in favor of the judgment (*Brooks*, *supra*, 3 Cal.5th at p. 57), and on this record, we find a rational jury could find defendant intentionally discharged the gun.  M.M.'s testimony and the voicemail recording demonstrated defendant broke into M.M.'s mobile home, pointed a

gun at her, and actively tried to keep her detained in her bedroom while he searched for someone else. When M.M. attempted to escape, defendant grabbed her by the arm "really hard," grabbed her hair, pulled her, and hit her "hard" on the head with the gun. The gun discharged just after he struck her. Defendant then pushed M.M. back into the bedroom, took her phone, and locked her inside. These facts indicate defendant intended to control M.M.'s movements, and a reasonable jury could infer firing the gun as M.M. attempted to escape was a part of this attempt at control. This is not speculation as defendant argues (see *People v. Memro* (1985) 38 Cal.3d 658, 695), but a reasonable deduction from the evidence (*Lee*, *supra*, 51 Cal.4th at p. 632) and indicative of the "enormous burden" defendant bears in his challenge to the sufficiency of the evidence (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330).

For these reasons, we reject defendant's sufficiency of the evidence challenge to the Penal Code section 12022.53, subdivision (c) enhancement. Upon return to the trial court, the prosecution will not be barred from including this enhancement allegation in any retrial.

## **DISPOSITION**

The judgment of conviction is reversed and the case is remanded for a new trial.

DETJEN, Acting P. J.

WE CONCUR:

PEÑA, J.

HARRELL, J.

22.